UNITED STATES of America, Appellee,

v.

Sayed Ali QAMAR, Defendant-Appellant.

No. 579, Docket 81–1331.

United States Court of Appeals, Second Circuit.

Argued Jan. 26, 1982.

Decided Feb. 22, 1982.

Anne C. Feigus, New York City (Ronald P. Fischetti, New York City, of counsel), for defendant-appellant.

Peter A. Norling, Asst. U. S. Atty., E. D. N. Y., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., Jane Simkin Smith, Asst. U. S. Atty., E. D. N. Y., Brooklyn, N. Y., of counsel), for appellee.

Before MESKILL and CARDAMONE, Circuit Judges, and HOLDEN, District Judge *.

MESKILL, Circuit Judge:

Sayed Ali Qamar challenges a judgment entered after a jury trial in the United States District Court for the Eastern District of New York, Sifton, *J.*, convicting him of one count of conspiracy to import hashish, 21 U.S.C. § 963 (1976). Qamar was acquitted on a second count, possession of hashish with intent to distribute, 21 U.S.C. § 841(a)(1) (1976); 18 U.S.C. § 2 (1976), and the jury failed to return a verdict, resulting in a mistrial, on a third count, importation of hashish, 21 U.S.C. §§ 952(a), 960(a)(1) (1976); 18 U.S.C. § 2 (1976). Qamar was sentenced to four years imprisonment. He is presently free on bail pending the disposition of this appeal. We affirm his conviction.

## BACKGROUND

The sole issue on this appeal relates to the district court's admission into evidence of "death threat" testimony. We briefly recount the prosecution and defense cases to provide the background against which this testimony was proffered.

### The Government's Case

The government called four witnesses in its case in chief. Shamim Adil testified that he and Qamar began discussing the possibility of importing hashish from East Pakistan in 1976. Adil recalled that Qamar knew how to smuggle the contraband out of Pakistan, but had no way to bring it safely into the United States. Adil later discussed hashish importation with Lakhi Uttam, a business associate and the owner of Asia Imports Company in Manhattan. In 1978, Adil introduced Uttam to Qamar. According to Adil, Uttam told Qamar that he could get hashish safely through United States Customs. Adil, Qamar and Uttam thereupon agreed to import hashish by air, to sell it, and to divide the proceeds evenly.

Adil stated that in the spring or summer of 1978, Qamar left for Pakistan to arrange a shipment of hashish. Upon his return, Qamar told Adil that the shipment had left Pakistan and gave Adil the airway bill to pass on to Uttam. Qamar later told Adil that the shipment had been lost.

Uttam testified under a plea agreement with the government that he was engaged in the importation of goods from India. Uttam corroborated Adil's testimony and provided details of the scheme to import hashish. Uttam stated that he suggested a plan to conceal the contraband in cartons of T-shirts and told Qamar that by retrieving the shipments after the customs officers went off duty, the importer could take most of the cartons away, leaving just one of

---

\* The Honorable James S. Holden, Chief Judge of the United States District Court for the District of Vermont, sitting by designation.

every ten or twenty behind for customs inspection the next day. By coding the cartons, the importer could be sure that the cartons left for inspection did not contain hashish.

Uttam further testified that after successfully importing a test shipment of ten cartons of T-shirts, two containing a total of fifteen to twenty pounds of hashish, and a larger shipment containing approximately 165 pounds of hashish, the parties attempted another 165 pound shipment. This time, however, customs officials intercepted the hashish. When Uttam first informed Qamar of the seizure, Qamar was very upset and did not believe Uttam. However, Qamar later confirmed the seizure.

According to Uttam, in June 1980 he and Qamar set out to import more hashish, this time concealing it within a cargo of rugs on the steamer Hellanic Valor. When the first shipment of rugs arrived, Uttam's trucker, Gurdip Hari, informed him that customs officials had opened it. Uttam rejected the delivery and informed Qamar of the customs inspection. Qamar accused Uttam of lying and unsuccessfully attempted to have the shipment delivered to other locations. Qamar contacted Uttam several times, finally coming to Uttam's office where he was later joined by two armed men.[1]

Uttam testified that at the meeting in his office, Qamar asked what had happened to the hashish. Uttam told Qamar that it had been confiscated. Qamar's associates then pointed their guns at Uttam and his shipping clerk, Abraham Benzaquen, and continued to inquire into the whereabouts of the hashish. The men assaulted Uttam, telling him that "[t]his is your last chance" to explain the disappearance of the hashish. They then threatened to kill Uttam and his family, telling Uttam that they knew where he lived and where his daughter waited for a school bus. After Uttam persisted in asserting that the hashish had been seized, Qamar forced Uttam to sign an agreement to pay $50,000 per week until the $3 million allegedly lost in the disappearance of the hashish was fully paid.

Abraham Benzaquen corroborated portions of Uttam's testimony, most importantly the account of the meeting at which Qamar and his associates threatened Uttam. The government's fourth witness, Customs Inspector Frank Monroig, testified that on December 19, 1980 he and fellow inspectors seized a shipment of hashish concealed within a cargo of cotton floor coverings on the Hellanic Valor at the piers in Brooklyn.

### The Defense Case

Qamar testified that he operated his own business, Kay Travel International, and was acquainted with Adil. He stated that Adil introduced him to Uttam, telling him that Uttam knew many people who were potential customers for Qamar as travelers to India and Pakistan. Qamar claimed to have traveled to Pakistan to tend to family business and to investigate the importation of surgical equipment for Uttam. Qamar testified that he later gave Uttam $5,000 to invest in silver which was never delivered. Qamar denied discussing hashish dealings with Uttam and denied threatening Uttam and his family.

Qamar called four other witnesses, two as character witnesses and two to refute details of the government's proof.

### DISCUSSION

◼ Qamar's sole claim on appeal is that the prejudicial effect of Uttam's testimony of death threats so outweighed its probative value that it resulted in an unfair trial. This Court has several times reviewed claims that the prejudicial effect of death threat evidence rendered it inadmissible. In no case have we reversed a conviction on this ground. Nevertheless, as this case illustrates, defendants have continued to assert that death threat testimony is governed by special rules and should be admitted only in exceptional circumstances. This opinion should put this unsound theory to rest.

The starting point of our inquiry is Federal Rule of Evidence 403, which provides:

---

1. Uttam's testimony relating to this meeting in his office was first introduced in the absence of

the jury. The court then permitted it to be repeated in the jury's presence.

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Our most recent and most comprehensive treatment of the admissibility of death threat evidence under Rule 403 appears in *United States v. DeLillo*, 620 F.2d 939, 943–46 (2d Cir.), *cert. denied*, 449 U.S. 835, 101 S.Ct. 107, 108, 66 L.Ed.2d 41 (1980), where we stated:

Appellants argue that our prior cases establish a principle that threat evidence cannot be introduced by the government except under "exceptional circumstances", which can be characterized as fair response to affirmative actions by the defense which "invite introduction of the threat evidence," *United States v. Malizia*, 503 F.2d 578, 581 (2d Cir. 1974). It is true that the fact patterns of some of our cases in this area fit this characterization. However, at no point has this Circuit ever held that the normal processes of Fed.R. Evid. 403 balancing must be supplemented by an additional, ironclad requirement that the defense "invite" threat testimony.

*Id.* at 944. The *DeLillo* opinion proceeded through a case-by-case review of this Circuit's recent death threat cases, *see United States v. Check*, 582 F.2d 668, 684–86 (2d Cir. 1978); *United States v. Panebianco*, 543 F.2d 447, 454–55 (2d Cir. 1976), *cert. denied*, 429 U.S. 1103, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977); *United States v. Rivera*, 513 F.2d 519, 528 (2d Cir.), *cert. denied*, 423 U.S. 948, 96 S.Ct. 367, 46 L.Ed.2d 284 (1975); *United States v. Malizia*, 503 F.2d 578, 580–82 (2d Cir. 1974), *cert. denied*, 420 U.S. 912, 95

S.Ct. 834, 42 L.Ed.2d 843 (1975); *United States v. Cirillo*, 468 F.2d 1233, 1240 (2d Cir. 1972), *cert. denied*, 410 U.S. 989, 93 S.Ct. 1501, 36 L.Ed.2d 188 (1973); *United States v. Briggs*, 457 F.2d 908, 910–11 (2d Cir.), *cert. denied*, 409 U.S. 986, 93 S.Ct. 337, 34 L.Ed.2d 251 (1972), and concluded:

All of our cases decided since the adoption of the Federal Rules of Evidence recognize that the central issue when threat testimony is sought to be introduced is the balance of probativeness and prejudice required by Fed. R. Evid. 403.

620 F.2d at 946.[2]

Qamar reads *DeLillo* to allow admission of death threat evidence only to impeach. Accordingly, he argues that the trial court acted prematurely in ruling the threat testimony in this case admissible prior to "a point in time when the government could properly have resorted to its introduction for impeachment purposes." Brief for Appellant at 14–15. Qamar relies on the following passage in *DeLillo*:

The question posed by the unusual fact pattern in the case at bar, then, reduces itself to whether or not the posture of testimony to the time the government sought to introduce evidence of Andrew DeLillo's threat was tantamount to impeachment of a witness.

620 F.2d at 945.

Read in isolation, this passage arguably supports the view that death threat evidence is admissible only for impeachment purposes. However, when we consider it in the light of the entire *DeLillo* opinion, we see the passage not as a statement of a general rule, but as an application of the law to the facts of that case. In the paragraph immediately following that contain-

---

**2.** Actually, only *Panebianco* and *Check* were decided between Fed.R.Evid. 403's effective date in 1975 and our 1980 decision in *DeLillo*. Both of these cases clearly employ the balancing test to measure the admissibility of challenged death threat testimony. In *Panebianco* the Court stated:

it was not an abuse of discretion for Judge Bonsal to conclude that the rehabilitative value of the death-threat testimony outweighed any unfair prejudice to [the defendant].

543 F.2d at 455. Similarly, the *Check* Court stated:

evidence, though relevant, may sometimes have to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice [to the defendant]." Fed.R. Evid. 403.

582 F.2d at 685.

**736**

ing the quote above, the *DeLillo* Court wrote:

> The importance of our concern with the government's need to introduce evidence of threats in order to help the jury resolve a credibility issue is a reflection of the fact that one element of this balance is probativeness. Of course, the balance between probativeness and prejudice will differ according to the purposes for which a piece of evidence is to be admitted. A death threat may be of very strong probativeness when it is directed against a witness and what is sought to be proved is that the witness' testimony was affected by it; and the prejudice is likely to be small because the jury will be instructed not to consider the threat on the question of the defendant's overall guilt. The prejudice is further reduced when, as in this case, the person who made the threat is not a defendant. There is a set of factors—the purpose for which the threat is sought to be admitted, the identity of the person making the threat—that a judge balancing under Fed.R.Evid. 403 must consider (although we do not mean these examples to be exclusive). We can say, and so hold, that the circumstances of which side makes what arguments and whose witnesses are involved, are irrelevant to this balancing, except insofar as they overlap with one of the factors mentioned above.

620 F.2d at 946. Thus, the *DeLillo* Court recognized that death threat evidence should be subjected to the same Rule 403 balancing test as other relevant evidence. If the threat is otherwise admissible, it should be allowed into evidence unless its prejudicial effect outweighs its probative value.

█ As our past decisions indicate, the potential prejudice from death threats may be great. *E.g., United States v. Check,* 582 F.2d at 685; *United States v. Malizia,* 503 F. 2d at 581. Thus, the government must have an important purpose for the evidence in order to satisfy the Rule 403 balancing test. Trial courts applying standard Rule 403 analysis may, therefore, exclude death threats more frequently than other evidence. We stress, however, that death

threats, just as other potentially prejudicial evidence, are to be judged by "the normal processes of Fed.R.Evid. 403 balancing." *United States v. DeLillo,* 620 F.2d at 944. The trial court's "exercise of broad discretion will not lightly be disturbed[,]" *United States v. Williams,* 596 F.2d 44, 50 (2d Cir.), *cert. denied,* 442 U.S. 946, 99 S.Ct. 2893, 61 L.Ed.2d 317 (1979), because it is in a better position to evaluate both the probativeness and the prejudicial effect of evidence.

█ Applying these principles to the facts of the instant case, we find no abuse of discretion in the admission of evidence that Qamar issued death threats against Uttam and his family. A determination of the credibility of witnesses was central to the jury's determination of guilt or innocence. Uttam, testifying for the government, and Qamar, testifying for himself, rendered wholly inconsistent accounts of their relationship. Qamar claimed that his association with Uttam was strictly legitimate. Uttam recounted their plan to smuggle hashish concealed within shipments of T-shirts and rugs. Thus, the jury clearly had to decide which witness it believed. The court ruled that the threat evidence was useful to explain the demeanor of Uttam, who "testified in an almost inaudible voice, speaks quickly . . . [and] displays ·on the stand some tendencies to want to get out of here and to get the questioning over with." App. at 92. In addition, the court opined that the threat would be likely to make a lasting impression on those present when it was made and would therefore explain Uttam's vivid recollection of the events surrounding the threat. Moreover, the court believed that any attempt to excise the threat from Uttam's account of the meeting during which it was made would result in confusing testimony riddled with suspicious gaps that would cause the jury to doubt Uttam's veracity. The government adds that without the threat evidence, it would have been severely impaired in its attempt to use another witness, Benzaquen, to corroborate Uttam's testimony. Since Benzaquen was present when the threats were made but was privy to few if any other relevant incidents, his account of the meeting at

which the threats were made, because it so closely paralleled Uttam's testimony, was both strongly corroborative and irreplaceable.

The court limited the potential prejudice from the death threats by admonishing the jury to consider the threat evidence only on the issues of the identity of the actors and the credibility of the witnesses. In addition, we note that the jury convicted Qamar on only one count of a three-count indictment. The jury's acquittal on a second count and its inability to agree on a third count belie the suggestion that the death threat testimony so inflamed the jurors' passions that Qamar was denied a fair trial.

The record in this case indicates that the trial court implemented Rule 403 by carefully weighing the prejudicial effect of the death threat evidence against its probative value, and by stating cogent reasons for its decision to admit the testimony. We find no abuse of discretion.

The judgment of conviction is affirmed. The mandate shall issue forthwith.