United States v. Morgan

# UNITED STATES COURT OF APPEALS

# FOR THE SECOND CIRCUIT

August Term, 2014

(Argued: January 26, 2015    Decided: May 19, 2015)

Docket No. 12-3231

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

Appellee,

- v.-

STEVEN RAY MORGAN,

Defendant-Appellant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Before:      JACOBS, CALABRESI and WESLEY, Circuit Judges.

Steven Ray Morgan appeals from the judgment of the United States

District Court for the Northern District of New York (McAvoy, J.), convicting

him, after a jury trial, of drug-related offenses including possession of a firearm

in furtherance of a drug-trafficking crime, and for being a felon in possession of

a firearm.  On appeal, Morgan argues: the district court abused its discretion by

admitting highly prejudicial evidence of his alleged threats to kill the

government's informant; the court committed plain error by conducting off-the-

record proceedings on important issues before and during the trial, thereby

failing to preserve the record; and his counsel rendered ineffective assistance.

We conclude that the district court abused its discretion in admitting the death

threat evidence, and that the error was not harmless. Accordingly, we need not

reach Morgan's other arguments. The judgment of conviction is vacated and the

case is remanded for retrial.

JANE SIMKIN SMITH, Millbrook, New York, for Appellant.

PAUL D. SILVER, United States Attorney's Office for the Northern District of New York, for Richard S. Hartunian, United States Attorney for the Northern District of New York, for Appellee.

DENNIS JACOBS, <u>Circuit Judge</u>:

It is long settled that the admissibility of death threats made by a

defendant is evaluated in accordance with the ordinary principles of Federal

Rule of Evidence 403. <u>See</u> <u>United States v. DeLillo</u>, 620 F.2d 939, 944, 946 (2d Cir.

2

1980).  At the same time, the potential for unfair prejudice is so great that Rule 403's balancing test permits admission of death threat evidence only if there is clear need for the evidence and it serves an important purpose.  See United States v. Qamar, 671 F.2d 732, 736 (2d Cir. 1982); see also United States v. Check, 582 F.2d 668, 685 (2d Cir. 1978).

While we "accord great deference to the district court's assessment of the relevancy and unfair prejudice of proffered evidence," United States v. Quinones, 511 F.3d 289, 310 (2d Cir. 2007) (internal quotation marks omitted), the district court must "conscientiously balance[] the proffered evidence's probative value with the risk for prejudice," United States v. Pepin, 514 F.3d 193, 205 (2d Cir. 2008) (internal quotation marks omitted).  Here we conclude that: the district court failed to make the careful assessment required for death threat evidence; admission of this evidence was an abuse of discretion; and the error cannot be viewed as harmless.  See United States v. Borello, 766 F.2d 46, 59 & n.22 (2d Cir. 1985).

Accordingly, we vacate the judgment of conviction and remand for a new trial.

BACKGROUND

To link Morgan to the gun and drugs that formed the basis for his prosecution, the prosecution relied in major part on the testimony of Keysha Williams, Morgan's former girlfriend.

In the course of her direct, Williams testified that Morgan sent her letters from prison seeking her assistance in the murder of the government's informant. According to Williams, Morgan wrote (in substance) that "the only way he was gonna see the light of day again was if the informant was killed," Trial Tr. at 311:23-24, United States v. Morgan, No. 08-cr-208 (N.D.N.Y. 2009) (hereinafter "Trial Tr."), and that Morgan "wanted [her] to take [the informant] to New York City" where "[o]ne of his boys was gonna hook him up," which she took to mean, "[k]ill him." Id. at 318:24, 319:1, 4.

Defense counsel interposed timely and strenuous objections:

> Judge, I have been objecting[ to] . . . this line of inquiry regarding my client allegedly telling this witness to take steps to have the informant killed. . . . I think that it is so prejudicial that I think that my client's chances of now having a fair adjudication by this jury have been destroyed because I think that this evidence is so damning in the context of this case that I respectfully submit it should not have been allowed. . . . This is not evidence that was needed by the Government in order to prove the case that my client is on trial for.

Id. at 320:15-18, 321:1-14.

Defense counsel then asked for a mistrial and, in the alternative, that the court strike the testimony or that the government be precluded from further pursuing this line of inquiry. Although counsel doubted that any limiting or curative instruction could be effective, he asked for that too. Id. at 321:20-25, 322:1-5. The government argued that the evidence was admissible as probative of Morgan's consciousness of guilt. Id. at 322:19-22.

The district court agreed with the defense that the evidence was extremely prejudicial and offered to give a limiting instruction, adding the caveat: "if I start talking about consciousness of guilt and inferences, it's gonna be like holdin' up a red flag in front of 'em." Id. at 325:12-14. The court further agreed with the defense that a limiting instruction was unlikely to cure the prejudice of the death threat evidence. As the court candidly observed: "There's no charge in this case in the indictment about attempting murder or a murder. This is about drugs and guns, as [the jury] know[s] from the beginning. Beyond that, I don't think I can do much. That might be worse for you than not saying anything." Id. at 322:12-16. Ultimately, no limiting instruction was proposed or given. The motions for a mistrial or to strike were denied. Id. at 324:1-2.

5

The prosecution then sought to introduce, through Williams, the very letters from Morgan that pertained to the threat. At that juncture, the court ruled them inadmissible on the ground that, after Williams's testimony, they would be cumulative.

On cross, the defense confronted Williams with a letter she wrote to the court seeking bail for Morgan to show Williams's state of mind, i.e., that she previously believed him innocent. (She testified that Morgan wrote it but that she agreed to send it as if she had drafted it.) The bail letter stated, in part:

> My name is Keysha Williams, and my fiancé is currently being held . . . in Albany county correctional facility. I believe that [Morgan's] current imprisonment is unlawful. . . . This seems to be a personal vendetta towards my fiancé. . . . I'm about to give birth to our son very soon and [Morgan's] not going to be around to experience the miracle of birth. Steven Morgan has done his time, he's no menace to society, he just did 10 yrs., and he turned his life around. Yet he's denied bail due to something [he'] already clearly been punished for. I cry myself to sleep every night, knowing that my husband-to-be has been sitting behind bars for the past 6 months. He has helped me as well as his community tremendously . . . . What happened to innocent until proven guilty? . . . . [H]e's a changed man. Everyone loves him and misses him . . . . [A]ll this man is guilty of [is] bringing a smile to a ghetto child's face.

Gov't App. at 126. (Between the dispatch of the bail letter and the time of trial,

6

Williams's relationship with Morgan soured appreciably.[1])

After the defense cross-examined Williams about her bail letter to the court, the prosecutor sought reconsideration of the ruling that Morgan's letters concerning death threats were inadmissible as cumulative, arguing that the defense had now "open[ed] up the door" for Morgan's letters, which the prosecutor said he was "itchin' to be able to get . . . in." Trial Tr. at 359:18-21. The government maintained that the death threat letters should be deemed "admissions that the defendant made," id. at 369:17-18, and were relevant to show that there had been a "change" in Williams's state of mind between the time she wrote the bail letter and her testimony at trial. Id. at 370:3-5.

Defense counsel objected that the jury had already heard Williams's state of mind: "she's already testified inconsistently with [the bail letter]." Id. at 370:19-20. The court agreed that this was "worthy of consideration," id. at 370:24-25, but then "revers[ed] [its] position on this matter," id. at 371:13, and

---

[1] Morgan accused Williams of infidelity and filed a petition in family court challenging his paternity with respect to her child, who Williams represented was his. The government introduced a letter into evidence in which Morgan expressed anger about not being sure if the baby was his and elicited testimony from Williams that Morgan threatened to kill her. Morgan eventually learned that he was not, in fact, the father of Williams's child.

ruled that the government could introduce the death threat letters, observing nevertheless that the government was "creating a great appellate issue for the defendant." Id. at 373:6-7.

On the government's redirect, Williams explained that she wrote the bail letter supporting Morgan to "help him get bail" because she "still love[d] him." Id. at 369:6, 8. The government then introduced, through Williams, Morgan's letter to her, which stated that the police "depend on . . . rats to convict people," that he was "not trying to spend the rest of [his] life in jail on account of a . . . snitch," that the informant had betrayed him despite "how good [he] treated his family," that the informant was his "only reason for being in [prison]," that he "need[ed] this matter dealt with," and that the informant "ha[d] to die." Gov't App. at 127-28.

The government argued in summation that the jury should "expect[] an instruction" allowing it to "infer" that Morgan "made the statement seeking to have [the informant] killed[] because he is guilty of the six crimes for which he's charged in this case." Id. at 608:16-20. At a sidebar, defense counsel objected to the remark, but the court ruled that the government's argument in summation required no further jury instruction.

8

Morgan was convicted on all counts. The defense made post-trial motions for judgment of acquittal, Fed. R. Crim. P. 29, and for a new trial, Fed. R. Crim. P. 33. The Rule 33 motion cited as error the admission of evidence that Morgan allegedly asked Williams to take the informant to New York City so that the informant could be killed. The defense argued that the testimony was so prejudicial that Morgan's constitutional right to a fair trial was irreparably damaged; that this error was compounded by the court's decision to allow the government to introduce the death threat letter, purportedly written by Morgan, containing the alleged instructions to Williams to take the informant to New York City to be killed; and that the erroneous admission of the letter was compounded by the government's argument on summation that the jury could view the death threat letter as evidence of the defendant's guilt. The district court denied Morgan's post-trial motions.

**DISCUSSION**

Rule 403 provides that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Civ. P. 403. However, the broad discretion afforded to the district court

9

in conducting that balancing is not limitless.  Where "there was inadequate

consideration of the probative value of the evidence," or a failure to adequately

"consider the risk of unfair prejudice and to balance this risk against probative

value," we will reverse an evidentiary determination as an abuse of discretion.

United States v. Figueroa, 618 F.2d 934, 942 (2d Cir. 1980).


**I**

"Evidence of threats by a defendant against a potential witness against

him can . . . be used to show guilty knowledge."  United States v. Bein, 728 F.2d

107, 114-15 (2d Cir. 1984).  That is certainly true when threats are "inextricably

intertwined with the evidence regarding the charged offense."  Quinones, 511

F.3d at 309 (explaining that the "record plainly demonstrates that the challenged

statements constituted important proof of the charged crimes: they contained

[the defendant's] admissions to the [charged] murder"); cf. United States v.

Tracy, 12 F.3d 1186, 1195 (2d Cir. 1993) (finding no abuse of discretion when

death threat evidence admitted to show defendant "was a member of the

conspiracy and played a role that gave him . . . familiarity with [its] operation,"

including acting as its "enforcer").

10

But the alleged death threats here bore no relation to the offenses for which Morgan was being tried.  See United States v. Lord, 565 F.2d 831, 836-37 (2d Cir. 1977) ("The attempt on [the witness's] life is the type of evidence that, even if relevant, might have to be excluded because of its potential for creating unfair prejudice.").   Moreover, the death threat evidence admitted during Williams's direct examination had substantial "capacity . . . to lure the [jury] into declaring guilt on a ground different from proof specific to the offense charged." United States v. Massino, 546 F.3d 123, 132 (2d Cir. 2008) (quoting Old Chief v. United States, 519 U.S. 172, 180 (1997)).

It cannot be said that the evidence of death threats had no tendency to demonstrate consciousness of guilt.  See Fed. R. Evid. 401(a).  At the same time, the government was required to demonstrate that it had an "important purpose" for the introduction of the death threat evidence during Williams's direct examination.  Qamar, 671 F.2d at 736.  Plainly, it is no such purpose to "induc[e] decision on a purely emotional basis."  Fed. R. Evid. 403 advisory committee's note.

We do not require a district court "to articulate the relevant considerations on the record," and we ordinarily assume that such due consideration was

11

given.  Leopold v. Baccarat, Inc., 174 F.3d 261, n.11 (2d Cir. 1999) (recognizing that "a simple 'sustained' or 'overruled' will ordinarily suffice" but that "[o]ur scrutiny of such an evidentiary ruling might be altered in the rare case where the record affirmatively reflects the trial court's failure to exercise its discretion properly").  However, this record cannot support an inference that an appropriate balancing was performed.  See United States v. McCallum, 584 F.3d 471, 477 (2d Cir. 2009) ("Because the court gave no explanation for its conclusion that the prior convictions evidence should be admitted . . . we are in no position to assume that the court appreciated the seriousness of the risk that introducing the [evidence] would undermine the fairness of the trial.").  Absent the requisite "important purpose," which we do not identify here, the prejudicial effect weighs heavily in the balance.

As the district court and defense counsel agreed, no limiting instruction would likely mitigate the prejudicial effect of the death threat evidence, i.e., the likelihood that the jury would substitute the death threat evidence for consideration of the elements of the charged crimes.  Cf. United States v. Robinson, 560 F.2d 507, 513-14 (2d Cir. 1977) ("Absent counterbalancing probative value, evidence having a strong emotional or inflammatory impact . . .

12

may pose a risk of unfair prejudice because it tends to distract the jury from the issues in the case and permits the trier of fact to reward the good man and to punish the bad man because of their respective characters despite what the evidence in the case shows actually happened. . . . The effect in such a case might be to arouse the jury's passions to a point where they would act irrationally in reaching a verdict." (internal quotation marks and citations omitted)).

Applying the ordinary principles of Rule 403, <u>DeLillo</u>, 620 F.2d at 944, the death threat testimony here--unrelated as it was to the charged crimes--should have been "kept from [the] jury because its potential for causing unfair prejudice outweigh[ed] its probative value with respect to [Morgan's] guilt." <u>United States v. Pannebianco</u>, 543 F.2d 447, 455 (2d Cir. 1976).

## II

The district court should likewise have excluded the additional death threat evidence admitted during the government's redirect examination of Williams. Leeway is afforded to introduce death threat evidence when the government is "responding to an issue already broached by the defendant." <u>Check</u>, 582 F.2d at 685. That is what the government contended at trial--

13

specifically, that the evidence was admissible to show a change in Williams's state of mind. However, this reasoning cannot support admission here. Crucially, the government did not argue that the death threat letter was probative of a change in *Morgan's* state of mind. But only *Morgan's* state of mind matters if the government's theory was that the death threat letter was admissible to show his consciousness of guilt.

Moreover, the government argued that Morgan was the author of the bail letter, which said that Morgan's imprisonment was unlawful, that he was "no menace to society," and that he should be allowed bail because he had "turned his life around." So, to the extent the bail letter reflected Morgan's state of mind (rather than Williams's), there could be no argument of a change that could overcome the court's earlier ruling that the death threat letters were cumulative. Accordingly, defense counsel's introduction of Williams's bail letter to the court could not have opened the door for the death threat letters.

The government made a halfhearted attempt to argue that the death threat letters were also admissible because, after Williams sent the bail letter on his

behalf, Morgan threatened her.  This argument too fails to support admission.[2]

Because Williams's state of mind cannot furnish a basis for admission, and the record does not support a conclusion that the death threat letters were admissible to show a change in Morgan's state of mind, we conclude that they were received into evidence not to show consciousness of guilt but rather to inform the jury that Morgan was the type of person who would enlist the help of his then-girlfriend in a plot to murder the person he viewed as the "only reason" he was in prison.  Trial Tr. at 377:14.  The admission of this death threat evidence was supported by no "clear need," Check, 582 F.2d at 685, or "important purpose," Qamar, 671 F.2d at 736.

## III

It is hard to deem harmless the erroneous admission of death threat evidence.  In this instance, the evidence was toxic.  Cf. United States v. Yousef,

_____

[2] This was not a prosecution in which the government needed to explain away an earlier failure by Williams to implicate Morgan.  To the contrary, she was the government's star witness against him.  Cf. Quinones, 511 F.3d at 312 (concluding statement was admissible to establish a "then-fearful state of mind").  As defense counsel argued, the jury had already heard Williams's state of mind and she had already testified inconsistently with the bail letter by providing inculpatory testimony against Morgan.

327 F.3d 56, 121 (2d Cir. 2003) ("Even where a district court has erred in admitting . . . evidence under Rule 403, we will disregard the error if there is fair assurance that the jury's judgment was not substantially swayed by the error." (internal quotation marks omitted)).  The testimony was highly charged, the letter read into the record was graphic and profane, and the proposed crime was unrelated to the charged offenses, and far more terrible.  (We see no need to quote the most inflammatory portions of the death threat letter.)

The evidence at trial was not so overwhelming as to alleviate the danger that the jury was influenced by the death threat evidence in a significant way. See, e.g., United States v. Dhinsa, 243 F.3d 635, 649-50 (2d Cir. 2001) (setting out harmlessness standard); see also Check, 582 F.2d at 684 (concluding harmlessness review "involves an analysis of the manner in which, in the total setting of the case, the error influenced the jury" (internal quotation marks omitted)).

- The prosecution relied substantially on the testimony of a cooperating informant and Williams.  But as to one of the two drug transactions that were chiefly at issue, Morgan was not on the scene.  The informant was there, and was purportedly on the phone with Morgan,

16

but though the informant was wired during the transaction, this conversation was not recorded.

- The drugs the informant purchased during the other drug transaction were filed under a different case name related to a different target and ultimately destroyed.

- The incriminating evidence, including the firearm, was found in a public stairwell.

None of this is to say that the government presented insufficient evidence to support Morgan's conviction--a claim neither pressed nor decided by this appeal. Rather, we examine the record to ascertain whether it can "provide us with fair assurance that the erroneously admitted evidence . . . did not substantially sway the jury" and conclude that it does not. United States v. Curley, 639 F.3d 50, 62 (2d Cir. 2011).

It is "not the appellate court's function . . . to speculate upon probable reconviction and decide according to how the speculation comes out." Kotteakos v. United States, 328 U.S. 750, 763 (1946). "But this does not mean that the appellate court can escape altogether taking account of the outcome." Id. at 764. The Court must "take account of what the error meant to [the jury], not

singled out and standing alone, but in relation to all else that happened." Id.
Here, the death threat evidence was "the government's most dramatic evidence"
at trial, a circumstance that "weigh[s] in favor of ruling that the error[] affected
[Morgan's] substantial rights." Curley, 639 F.3d at 62-63.

Finally, the government placed considerable emphasis on the death threat
evidence. The effort to introduce it was at first denied as cumulative. At a side
bar, the government told the court that it had "a hundred" such letters, which it
was "itchin'" to introduce. The message that Morgan was dangerous was
amplified to the jury when the informant who was the target of threats testified
in a disguise and under a pseudonym. And, in closing, the government argued
to the jury that the death threats were evidence of Morgan's guilt. Even if it
would otherwise have been proper for the government to argue in its summation
that the death threats evinced *consciousness* of guilt, we cannot conclude that the
"government placed no undue emphasis on the threats." Quinones, 511 F.3d at
310.

## CONCLUSION

For the foregoing reasons, we vacate the judgment of conviction and remand for a new trial.