TORRES, District Judge,
concurring in the judgment:
With respect to the bulk of the issues on appeal, I join the summary order issued concurrently with this opinion. I write separately, however, because I disagree with the majority’s conclusion that the district court did not abuse its discretion in admitting into evidence excerpts from the movie The Town. Because, however, the admission of the clips constituted harmless error, I respectfully concur in the judgment.
[[Image here]]
The facts are set forth in the majority opinion and need not be recounted in detail. However, it is worth examining more closely the three movie clips shown to the *498 jury and the Government’s justifications for admitting each.
The Government first played Clip 2 — a scene from the movie The Town depicting a bank robbery under way. See Gov’t Ex. 79 (Clip 2). Clip. 2 begins inside the bank with a close-up of a robber carrying what appears to be a submachine gun and wearing a skeletal Grim Reaper mask with a hooded black overcoat. As one voice shouts, “We gotta go,” the robber’s gaze shifts to the bank’s opaque glass front door, where a silhouette on the street walks by. Another voice yells “Let’s Go!” as the music swells with a cymbal roll and a thundering drum beat. The film then cuts to three robbers in the teller area— also carrying assault rifles and dressed as the Grim Reaper. A voice exclaims, “Let’s bleach it up!” The robbers then pass around a large white plastic bottle and hastily pour a liquid — presumably bleach— on the tellers’ workstations. In the background, three hostages sit on the floor. The excerpt features swift cutting, with six shots in the nine-second excerpt.
After playing the clip, the Government witness, a detective who had just finished testifying about the processing of fingerprint and DNA evidence, explained to the jury that the excerpt shows “the [film’s] perpetrators robbing a bank and in that container it contained bleach and they are pouring it by the drawers and the teller area where they possibly touched.” J.A. at 1076.
The Government then played Clip 4. See Gov’t Ex. 79 (Clip 4). Clip 4 depicts a man outside of a locked room. He is carrying a handgun and is dressed in a police uniform. A black cloth covers all but his eyes and ears. Dark sunglasses obscure his eyes. Using the gun, he pounds on a locked door and shouts to get the attention of two middle-aged, male employees in “the cash room.” He proceeds to identify the men, announcing their names, home addresses, and wives’ names. He warns them not to call for help and to open the door, yelling “we have men outside your homes.” The camera cuts to a close-up of their anxious faces and dramatic music highlights the tension of the situation. The robber is buzzed in, he enters the cash room, and points his. gun at an employee’s head.
After the clip was played, the detective noted that the perpetrator “was dressed as a police officer” and explained to the jury that the robber “knew their routines, he knew who their families] were. He basically threatened them if they were going to make a distress call, that their family would get hurt.” J.A. at 1077.
The Government then played Clip 3. See Gov’t Ex. 79 (Clip 3). Clip 3 depicts the robbers inside of a car, driving down a sunlit city street, busy with traffic and’ pedestrians. When the driver says, “Say your prayers; here we go,” each robber dons a mask depicting an elderly nun: the skin is deeply furrowed, and the features exaggerated. Each robber also wears a nun’s habit. The clip ends with a close-up of one robber — assault rifle in his gloved hand — staring out of the car window, straight into the camera. The music builds to a crescendo and the excerpt closes on a dramatic, dissonant chord. The Government did not question the witness about this clip.
[[Image here]]
Although the standard of review is highly deferential, see United States v. Massino, 546 F.3d 123, 132-33 (2d Cir. 2008) (per curiam), “the broad discretion afforded to the district court” in weighing the admissibility of evidence under Rule 403 “is not limitless,” United States v. Morgan, 786 F.3d 227, 232 (2d Cir. 2015). Evidence maybe unfairly prejudicial if, for example, “it tends to have some adverse effect upon a *499 defendant beyond tending to prove the fact or issue that justified its admission into evidence,” such as a “tendency ... to prove some adverse fact not properly in issue or unfairly to excite emotions against the defendant.” Massino, 546 F.3d at 132-33 (quoting United States v. Figueroa, 618 F.2d 934, 943 (2d Cir. 1980)). On review of-a district court’s evaluation of evidence, this Court will “generally ‘maximiz[e] its probative value and minimiz[e] its prejudicial effect.’ ” United States v. LaFlam, 369 F.3d 153, 155 (2d Cir. 2004) (per curiam) (alterations in original) (quoting United States v. Downing, 297 F.3d 52, 59 (2d Cir. 2002)). Even so, weighing the movie clips’ minimal probative value against their potential for unfair prejudice,- I would hold that the district court abused its discretion in allowing them to be introduced into evidence.
The Government argued, in its motion in limine before the district court, that the excerpts bear a “striking resemblance” to the 2012 robbery.in this case because in both situations the robbers (1) pour bleach on surfaces, (2) wear police uniforms as disguises, (3) use personal information to threaten an employee at the scene, and (4) wear life-like masks. J.A. at 423-24. The Government argued that the clips “provide the context and motivation for the drastic change in the defendants’ robbery techniques” from 2010 to 2012 and that there is “little risk” of unfair prejudice because “it will be identified as a fictional Hollywood film depicting actors.” J.A. at 425.
In reviewing the three excerpts, I find that, despite the similarities between the 2012 robbery and the fictive crimes, the clips were unfairly prejudicial. According to the Government, Clip 2 was probative to the extent that it illustrates why the defendants used bleach to destroy DNA evidence at the crime scene. J.A. at 1076. But Defendant-Appellant Akeem Monsalvatge would already have been aware of the importance of destroying DNA evidence: when he was arrested for the 2010 robbery, he was told that his DNA was found at the scene. See, e.g., J.A. at 2427. The defendants, therefore, did not need a Hollywood movie to instruct them on the role DNA evidence plays in identifying perpetrators. Although it is' possible that the defendants’ use of bleach was informed by the movie, a simple search on Google comes to the same lesson: one of the first results in a search for “what destroys DNA at a crime scene?” is a discussion board that suggests using bleach. What destroys dna?, SciForums.com, http:// www.sciforums.com/threads/what-destroys-dna.45471/. The probative value of this clip regarding the use of bleach is, at best, slight.
Clip 4 depicts a robber, disguised as a police officer, using the bank employees’ personal information to threaten them. The Government contends that when committing the 2012 robbery, the defendants were mimicking the fictional robbers in the movie. But, given the uncommonly clumsy manner in which the defendants committed the 2010 robbery — entering through the roof of a cash-checking business and leaving behind tools — it is likely that the defendants actively considered alternative approaches for future robbery attempts. Impersonating a police officer is not a novel technique: the New York City Police Department even has a Police Impersonation Investigation Unit. See, e.g., J.A. at 1004-05. However, the use of the Pay-O-Matic employee’s personal information while dressed as a police officer is similar to The Toum, and there is some probative value in this similarity.
Finally, the excerpts’ probative value regarding the defendants’ use of masks is negligible. Not only is wearing a disguise for a robbery a scene a faire, but, when *500 committing the 2010 robbery, the defendants had already employed the technique of covering their faces using, according to one witness at trial, a “cloth mask.” J.A. at 1400, 1402. Thus, with respect to their use of a device to obscure their faces, any similarity between the 2012 robbery and The Town does not tend to prove that'the defendants adopted a new approach.
. As this Court has long held: “The length of the chain of inferences necessary to connect the evidence with the ultimate fact to be proved necessarily lessens the probative value of the evidence, and may therefore render it more susceptible to exclusion as unduly confusing, prejudicial, or time-consuming....” United States v. Kaplan, 490 F.3d 110, 122 (2d Cir. 2007) (alteration in original) (quoting United States v. Ravich, 421 F.2d 1196, 1204 n.10 (2d Cir. 1970) (Friendly, J.)). The Government did not argue that the defendants acknowledged that these techniques were gleaned from The Town. Instead, the Government’s theory at trial was that a photograph showing Monsalvatge wearing a t-shirt that featured an image from the movie suggests that he and his co-conspirators used the film as a how-to-guide for their 2012 robbery. J.Á. at 1079-80. Although it is a reasonable inference that the t-shirt indicates that Monsalvatge was familiar with the movie, it is a stretch to infer that he admired the movie’ for its educational value. The inference that the defendants sought to emulate the actions of Active criminals because one individual ordered a t-shirt depicting a scene from a widely released, blockbuster film is beyond tenuous, which further minimizes the probative value the clips might have. Cf. United States v. Gamory, 635 F.3d 480, 493 (11th Cir. 2011) (finding a rap video inadmissible where video was prejudicial and “not clearly probative of [defendant’s] guilt,” and where connection between defendant and video’s creation was tenuous).
The majority opinion cites eases from outside of this circuit where film excerpts were admitted to explain a defendant’s behavior. In each of those cases, however, the connections between the defendant and the film, and the film and the crime, were much stronger. See United States v. Schneider, 801 F.3d 186, 199-200 (3d Cir. 2015) (affirming decision to admit clips from a film about a ballet dancer and his older patron and lover in a case where older defendant had shown the film to his victim, a young ballet dancer); United States v. Smith, 749 F.3d 465, 496-97 (6th Cir.) (affirming admission of film excerpts in which “salesmen working for a fictional investment firm employ high-pressure sales tactics to defraud clients” in a prosecution for fraud where defendants “made copies of [the film] and encouraged salesmen to learn from the . movie”), cert. denied, — U.S. —, 135 S.Ct. 307, 190 L.Ed.2d 223 (2014); United States v. Jayyousi, 657 F.3d 1085, 1108-09 (11th Cir. 2011) (affirming admission of clips from a CNN interview with Osama bin Laden that two defendants had discussed in phone calls); United States v. Wills, 346 F.3d 476, 484 n.6, 489 (4th Cir. 2003) (affirming decision to admit excerpts of the film The Casino to explain what one defendant meant when he stated in a tape-recorded conversation, “I’m Casino.... You see the movie? ... Well anyway, I was doing a Casino joint”). Here, in contrast, the Government adduced no evidence that the defendants watched The Town, discussed the film with one another, or, most importantly, developed a plan based on the film. Because The Town excerpts are so far removed from the ultimate fact to be proven — that is, whether the defendants actually committed robbery — the probative value of the clips is diminished. See Kaplan, 490 F.3d at 122 (“The jury was required to draw a series *501 of inferences, unsupported by other evidence, to connect Gaikovich’s testimony ... [to] the ultimate issue in the case. Under the circumstances, the district court should have concluded that whatever slight probative value the testimony might have had was outweighed by the risk that the jury would draw improper inferences from the testimony.”).
Although some of the techniques employed by the fictional robbers in The Town are similar to the modus operandi in this case, there are significant differences that vitiate the clips’ probative value. See, e.g., United States v. Reese, 933 F.Supp.2d 579, 582-83 (S.D.N.Y. 2013) (citing United States v. Danzey, 594 F.2d 905, 911 (2d Cir. 1979)) (finding that prior acts were dissimilar enough to be inadmissible to show modus operandi under Rule 404(b)). Unlike the robbers in the movie, the defendants did not carry “very fieree-looking assault weapons,” as the district court noted to the jury. J.A. at 1307. Although one defendant showed one of the Pay-O-Matic employees a photograph of her house and asked if she recognized it, he did not claim that someone was currently outside the house ready to harm the victim’s family. J.A. at 700-01, 1307. The defendants’ masks were life-like disguises, unlike the Grim Reaper masks and distorted nun masks worn by the robbers in The Town. See, e.g., J.A. at 699-700, 732. Given the generic and superficial similarities between the movie excerpts and the 2012 robbery, the long inferential chain required to connect the evidence to the crime, and the differences between the excerpts and the crime, the clips’ probative value is slight.
To the extent that the excerpts are marginally probative and the clips “tend[ ] to prove the fact or issue that justified [their] admission into evidence,” that value is outweighed by the serious risk of “unfairly ... excising] emotions against the defendant.” Massino, 546 F.3d at 132-33. The potential for unfair prejudice extends beyond the fact that the clips depict robbers carrying heavy assault weapons, which are far more deadly than the pistols used by the defendants. Unlike the objective of a criminal trial — to ensure the fair and impartial administration of justice — the goal of commercial cinema is to thrill and entertain. It is a manipulative art designed to elicit an emotional response from the viewer. To this end, filmmakers employ a variety of tools such as costumes, music, cinematography, lighting and editing— strategies not utilized in surveillance videos routinely presented at trials. The psychological effect on a juror of watching an actor dressed as the Grim Reaper gripping a submachine gun as he robs a bank to a thundering drum beat should not be underestimated. The risk that a juror — even a juror who has been instructed by the court to ignore the “make believe” elements of the evidence, J.A. 1075 — might conflate fiction and reality is obvious. And, it is a risk that threatens to undermine a defendant’s right to a fair trial. Cf. United States v. Sampson, 335 F.Supp.2d 166, 191-93 (D. Mass. 2004) (excluding memorial video of victim that featured “evocative” and “poignant” music that “would have inflamed the passion and sympathy of the jury”). As The New York Times noted in its review of The Town, Clip 2, which was part of the film’s opening sequence, is “brutal” and “evidence of Mr. Affleck’s skill and self-confidence as a director.” A. O. Scott, Bunker Hill to Fenway: A Crook’s Freedom Trail, N.Y. Times (Sept. 17, 2010), http://www.nytimes.com/2010/09/ 17/movies/17town.html.
The potential for prejudicial impact is further amplified by the fact that the magistrate judge who conducted the voir dire did not ask the venire whether they had seen The Town. The voir dire was conducted on the morning on July 29, 2013, by *502 Magistrate Judge James Orenstein. See J.A. at 434. Indeed, when discussing the issue of whether to ask potential jurors if they had seen the movie, Judge Orenstein stated that “If I were at the defense table, quite honestly, I think I would want to know just to have more information rather than less, but if you object, I’m not going to do it.” J.A. at 439. Because the district court had not yet ruled on the clips’ admissibility — the district court judge ruled on the Government’s motion in limine later that day, J.A. at 643 — defense counsel for Defendant-Appellant Derrick Dunkley declined Judge Orenstein’s invitation to question potential jurors about the film, stating, “I object to it. And even if the movie does come in, which I don’t think it’s that likely ... [,] I think even bringing it up suggests that it’s similar to the actions in this case which I don’t think is true.” J.A. at 439-40. That some of the jurors may have seen the movie — which is not unlikely, given that The Town was the highest-grossing movie in its opening weekend (over $92 million domestically) and was nominated for an Academy Award, see The Town, Box Office Mojo, http://www. boxofficemojo.com/movies/?id=townlO. htm — eliminates the limiting effect of the clips’ tailoring and exponentially increases the risk of unfair prejudice.
This circuit has not addressed the use of Active videos as evidence, but other courts have expressed deep distress about such evidence’s impact on the jury. See Gamory, 635 F.3d at 493 (finding a rap music video to be unfairly prejudicial because it contained content unnecessary and unrelated to the criminal case); Bannister v. Town of Noble, 812 F.2d 1265, 1269 (10th Cir. 1987) (discussing the concern that a “jury will better remember, and thus give greater weight to, evidence presented in a film as opposed to more conventionally elicited testimony”); Sampson, 335 F.Supp.2d at 192-93 (discussing how a video “would have inflamed the passion and sympathy of the jury”); Thomas v. C. G. Tate Constr. Co., 465 F.Supp. 566, 571 (D.S.C. 1979) (discussing the concern that a video may “stand out in the minds of the jury” and will have a “dominating effect [that] will distract the jury from its proper consideration of other issues they will be called on to decide”); cf. Territory of Guam v. Shymanovitz, 157 F.3d 1154, 1158-59 (9th Cir. 1998) (finding that pornographic magazines found in the apartment of a defendant accused of sexual contact with minors was inadmissible to show propensity, lamenting that the case against an individual could be made stronger because of his book collection); United States v. Stone, 852 F.Supp.2d 820, 830-31 (E.D. Mich. 2012) (holding anti-government books found in the defendant’s home inadmissible, saying that connecting the acts in the books to the allegations in the case was “pure speculation” and worrying about the risk of “associating [the defendants in the minds of the jurors with the perpetrators of these other crimes [featured in the books]”); see generally United States v. Johnson, 529 F.3d 493, 501 (2d Cir. 2008) (“We recognize that the government may be tempted to make its presentation to the jury more compelling, dramatic, and seductive .... ”).
Although it is true that, generally, this Court “declines to second-guess a district court’s admission of relevant video or media evidence,” Federal Rule of Evidence 403 requires more than merely “an identifiable connection to an issue or defendant in the case.” (Maj. Op. at 496.) The cases cited by the majority do not hold otherwise; indeed, all show a strong nexus between the challenged evidence and the criminal activity at trial. In United States v. Cromitie, this Court admitted a “20-second video of a demonstration explosion set off by a bomb placed on the back seat *503 of a car and constructed with the type and amount of material that the defendants thought was in the fake devices they were planning to use in the operation.” 727 F.3d 194, 225 (2d Cir. 2013). The video was introduced “to establish that the fake bombs, if real, would have qualified as ‘destructive devices’ ” under relevant statutes. Id. These fake bombs were created by the FBI and provided to the defendants, United States v. Cromitie, No. 09 Cr. 558, 2011 WL 1842219, at *3 (S.D.N.Y. May 10, 2011), aff'd, 727 F.3d 194 (2d Cir. 2013), which made the video demonstration important to the Government’s charge that the defendants conspired to do harm. In United States v. Abu-Jihaad, this Court upheld the admission of pro-jihadist videos found on a terrorist organization website because there was extensive evidence of correspondence between the defendant and the organization. 630 F.3d 102, 113, 133-34 (2d Cir. 2010). And in United States v. Salameh, this Court affirmed the admission of anti-American materials — including a video clip depicting a bombing that closely resembled the World Trade Center bombing committed by the defendants as well as documents that provided instructions on how to construct bombs and mix explosives to destroy buildings — that were in the possession of two defendants because the evidence demonstrated not only the “motive and intent” of the defendants, but also “formulae for the same explosives that were used to construct the World Trade Center bomb, and [defendants’] fingerprints were found on those pages,” and “traces of those same explosives were found in the homes of, and on objects linked to” the defendants. 152 F.3d 88, 111 (2d Cir. 1998). The film ■ clips from The Town are far less probative than the evidence in these three cases where only a minimal inferential leap is required to connect the video clips to the crimes alleged.
Finally, to the extent the similarity between the movie excerpts and the 2012 robbery is probative, the district court should have considered other means of admitting the facts of that similarity into evidence that would have avoided the unfairly prejudicial nature of the film clips. “[W]hen Rule 403 confers discretion by providing that evidence ‘may’ be excluded, the discretionary judgment may be informed not only by assessing an evidentia-ry item’s twin tendencies, but by placing the result of that assessment alongside similar assessments of evidentiary alternatives.” Old Chief v. United States, 519 U.S. 172, 184-85, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997); see also Fed. R. Evid. 403 advisory committee notes (“The availability of other means of proof may also be an appropriate factor.”). Rule 403 “permits a judge to consider both the defendant’s willingness to stipulate and the potential for prejudice [in later phases] in conducting the requisite [Rule 403] balancing.” United States v. Al-Moayad, 545 F.3d 139, 160 (2d Cir. 2008) (alterations in original) (quoting United States v. Pepin, 514 F.3d 193, 206-07 (2d Cir. 2008)). Where there is alternative but equally probative evidence available, a court may consider the “marginal probative value” of the proposed evidence relative to the other evidence in the case. Old Chief, 519 U.S. at 185, 117 S.Ct. 644 (citing 1 McCormick 782, and n. 41); see 1 McCormick On Evid. § 185 (7th ed.) (“If other evidence, which does not carry the same dangers with it, could be used to establish the same fact, then the marginal probative value of the evidence in question is slight or nonexistent.”).
Accordingly, in Al-Moayad, this Court concluded that the district court acted arbitrarily in admitting the evidence that “almost entirely unrelated to the elements of the charges.” 545 F.3d at 161. Such evidence is not afforded the same weight *504 when applying the general rule that “the prosecution is entitled to prove its case by evidence of its own choice.” Id. (quoting Old Chief, 519 U.S. at 186, 117 S.Ct. 644). Rather, where testimony “never referred to either defendant or to any aspect of the investigation or charges against them,” the Supreme Court’s concern about the government’s “natural sequence of narrative evidence,” id. (quoting Old Chief, 519 U.S. at 189, 117 S.Ct. 644), “has little to no application,” id. The testimony “amounted to a blatant appeal to the jury’s emotions and prejudices,” and omitting the testimony “would not have disrupted the narrative flow of the government’s trial evidence.” Id. Given the availability of the less prejudicial option — the defendants agreed to stipulate to the probative facts — this Court concluded that admitting the evidence was arbitrary and reversible error. Id. at 160-61.
Similarly here, to the extent the film excerpts had probative value by showing similarities between certain criminal techniques utilized in both The Town and the 2012 robbery, the district court could have allowed a less prejudicial form of evidence — such as a stipulation or additional testimony from the detective who testified that he had “seen the movie several times” and gave a brief overview of the movie, J.A. 1073-74. The movie clips did not add probative value; they increased the risk of unfair prejudice.
In sum, I do not think Rule 403 allows a court to risk that a juror will watch clips featuring criminal acts and resist the film’s strong emotional appeal, an effect that a Hollywood movie is designed to have. See United States v. Robinson, 560 F.2d 507, 513-14 (2d Cir. 1977) (“Absent counterbalancing probative value, evidence having a strong emotional or inflammatory impact ... may pose a risk of unfair prejudice because it tends to distract the jury from the issues in the case and ... [might] arouse the jury’s passions to a point where they would act irrationally in reaching a verdict.” (internal quotation marks omitted)). In particular, Clips 2 and 3, which were relevant only with respect to the similarities of robbers wearing a mask and spreading bleach, had only limited and speculative probative value. Considering the prejudicial effect of jurors conflating the defendants with the actors and actions depicted in the Active sequences, and given the availability of equally probative but vastly less prejudicial forms of evidence, I would hold that the district court abused its discretion in allowing the film clips.
* * *
Furthermore, the district court abused its discretion by failing to adequately weigh the movie excerpts’ probative value against their potential for unfair prejudice. “To avoid acting arbitrarily, the district court must make a conscientious assessment of whether unfair prejudice substantially outweighs probative value.” United States v. Kadir, 718 F.3d 115, 122 (2d Cir. 2013) (quoting Al-Moayad, 545 F.3d at 160); see also Figueroa, 618 F.2d at 943. This Court will reverse an evidentiary determination if “ ‘there was inadequate consideration of the probative value of the evidence,’ or a failure to adequately ‘consider the risk of unfair prejudice and to balance this risk against probative value.’ ” Morgan, 786 F.3d at 232 (quoting Figueroa, 618 F.2d at 942); cf. Salameh, 152 F.3d at 111 (affirming where the “record amply demonstrates that [the district court] made a ‘conscientious assessment’ of the proffered evidence and properly determined that unfair prejudice did not substantially outweigh the probative value of these materials”).
In its motion in limine, the Government argued that the film clips were relevant under Federal Rule of Evidence 401 and *505 admissible under Federal Rule of Evidence 402 based on Monsalvatge’s “custom-made T-shirt” depicting one of the movie’s scenes and the “film’s striking similarity to important aspects of the 2012 robbery,” which “helps explain the origin of defendants’ modus'operandi during that robbery.” J.A. at 424-25. The Government stated that it would limit unfair prejudice by identifying the film as fictional and showing only limited clips. See J.A. 424-25. Counsel for Dunkley and Defendant-Appellant Edward Byam each submitted a letter opposing the Government’s motion; the former argues that the clips are inadmissible under Rule 403. J.A. at 430; see J.A. at 428-30, 431-33.
When the district court decided the issue, it focused exclusively on relevance and did not make a finding on the record regarding Rule 403. In a hearing in the afternoon of July 29, 2013, the district court ruled on the Government’s motion in limine, stating in full: “The movie ‘The Town’ is an interesting thing. We’ve looked at the clips. I understand that there was a T-shirt recovered from Mr. Monsalvatge depicting a particular still scene from that movie. I understand the theory. I think it’s admissible, and I will allow it.” J.A. at 643. Significantly, the trial judge did not evaluate the probative value of the evidence or the risk of unfair prejudice, nor did he appear to balance the two. See Morgan, 786 F.3d at 232. I would find, therefore, that the district court abused its discretion by failing to make a clear record of its “conscientious assessment.”
[[Image here]]
Finally, this Court reverses a district court on an evidentiary error only when the error affects “substantial rights.” Fed. R. Crim. P. 52(a); Fed. R. Evid. 103(a); see also, e.g., Kaplan, 490 F.3d at 122. On such review, an appellate court must ask “what effect the error had or reasonably may be taken to have had upon the jury’s decision.” Kotteakos v. United States, 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). This Court must answer: “Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?” United States v. Taylor, 745 F.3d 15, 27 (2d Cir. 2014) (quoting Neder v. United States, 527 U.S. 1, 18, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)). Among the factors this Court principally considers are: “(1) the overall strength of the prosecution’s case; (2) the prosecutor’s conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence.” Id. (quoting Zappulla v. New York, 391 F.3d 462, 468 (2d Cir. 2004)). “We have repeatedly held that the strength of the government’s case is the most critical factor in assessing whether error was harmless.” United States v. McCallum, 584 F.3d 471, 478 (2d Cir. 2009) (citing United States v. Lombardozzi, 491 F.3d 61, 76 (2d Cir. 2007)).
Although the admission of the film excerpts was an abuse of discretion, the admission was harmless error. The evidence presented against the defendants regarding the 2012 robbery was overwhelming, and the film clips’ significance to the crimes charged minimal.
The Government’s case was strong. In addition to extensive evidence regarding the 2010 robbery and the attempted robbery, the Government presented a variety of evidence tying the defendants to the 2012 robbery. First, evidence tied Byam to the scene of the crime. Surveillance videotape depicted the three robbers showing a Pay-O-Matic employee a photograph of the employee’s house. The photo, which fell to the floor and was later recovered by investigators, J.A. at 857, 1057-58, was stamped *506 “Walgreens” and contained identifying information including the Walgreens store number, an order number, and a date, J.A. at 861, 1058. Investigators identified the Walgreens store, which matched the order number to a receipt that identified the name “Byam, E.” and a phone number that matches Byam’s. J.A. at 866-67, 1019, 1115. Surveillance video from the Wal-greens store showed Byam dropping something off at the Walgreens photo counter in early December 2011 and picking something up the next day. J.A. at 884-86.
The Government presented evidence that Dunkley purchased NYPD disguises online. The evidence indicated that a “Derrick Davis” — Davis is the last name of Derrick Dunkley’s aunt — ordered three NYPD raincoats on eBay in November 2011 and had them shipped to Dunkley’s residence. J.A. at 1029-33, 824, 1998. An eBay seller testified that “Derrick Davis” also bought three leather NYPD-style badge holders, which were shipped to Dunkley’s address. J.A. at 1239-42. An eBay corporate representative testified that the “Derrick Davis” user account that made these purchases was linked to Dunk-ley’s credit card and address. J.A. at 1547, 1551-52,1554-57.
The Government also presented evidence that Byam and Monsalvatge were involved in purchasing high-end masks that match those used by the robbers during the 2012 robbery. An NYPD detective testified that, based on his review of the surveillance footage, he concluded that the robbers were wearing high-quality, life-like masks. J.A. at 887-90. The detective contacted two companies that make such masks to verify whether either had shipped masks resembling the surveillance footage to anyone in the New York area. J.A. at 890. The owner of Composite Effects, one of those companies, testified that Byam had ordered three special effects masks in October 2011, which totaled just under $1,800. J.A. at 1446. The masks were shipped to Monsalvatge’s girlfriend, with whom Monsalvatge lived. J.A. at 1130, 1445, 2015. E-mails sent by Byam to Composite Effects included the same phone number that was listed on the Walgreen’s receipt for the photograph shown during the robbery to the Pay-O-Matic employee. J.A. at 866-67, 1115, 1445. In late November 2011, Byam e-mailed Composite Effects to state that he was “extremely pleased” with the masks and to ask for advice on wearing the masks. J.A. at 1451-52, 1171. The owner of Composite Effects identified one of the masks in the surveillance video as one created by his company, J.A. at 1452-55, and testified that an individual’s lips may be visible through the mask when not properly fitted, J.A. at 1449-50, which could explain one witness’s account that all three robbers had brown lips despite their faces being light-skinned, J.A. at 761-62, 872-83.
When Monsalvatge was arrested, he was found with a police scanner that resembled the one in the surveillance video. J.A. at 2020-22; see J.A. at 880. When Byam was arrested, he- had in his possession a partially completed Pay-O-Matic employment application, J.A. at 2122-24, and luxury items — including Gucci luggage, a Rolex watch worth over $10,000, Louis Vuitton sneakers, and a gold and diamond earring — were found at his residence, J.A. at 2130. When Dunkley was arrested, a search of his computer showed an internet search for “NYPD jackets” and multiple searches about the federal criminal justice-system. J.A. at 2264-67.
The Government connected the black Ford Explorer used in the robbery to Byam; the car was also caught on surveillance tape outside the Pay-O-Matic twice in the week before the robbery. J.A. at 891-92; see J.A. at 713, 799-801, 852-53, *507 881-88. The Government presented evidence establishing that all three defendants had conducted transactions at a Pay-O-Matic store, totaling nine transactions in 2010 and 2011, J.A. at 819-28, and presented text messages between the defendants that suggested criminal activity, see generally J.A. at 2291-806.
Finally, the Government presented evidence establishing that all three defendants went on spending sprees in the months after the 2012 robbery: Dunkley deposited thousands of dollars of cash into his checking account, J.A. at 1344-50; Mon-salvatge opened a new bank account on February 15, 2014 and deposited over $6,000 in cash, J.A. at 1182-85; Byam and Monsalvatge took a trip to Cancún in May 2012, J.A. at 1131; Byam bought his girlfriend a pair of Christian Louboutin shoes and bought himself Gucci luggage, J.A. at 1133-35; and Monsalvatge’s accounts showed thousands of dollars spent on spas, luxury goods, and extensive travel, J.A. at 1184-88.
The film excerpts from The Tenon were a relatively small part of the evidence presented by the Government: the clips that were played totaled.only one minute in length, a small sliver of the six-day trial, and were only briefly addressed by the testifying witness. See J.A. at 1074-77. The excerpts were not discussed again until summations, when they were again only one small piece of a much larger picture. See J.A. at 2426-28. Counsel for each defendant discredited the importance of the clips in their respective summations. See J.A. at 2474, 2497-98, 2526. In light of the weight of this evidence and the relatively small role the film clips played at trial, it is beyond a reasonable doubt that a jury would have convicted the defendants regardless of the admission of the movie excerpts. See United States v. Chandia, 514 F.3d 365, 375 (4th Cir. 2008) (“Even if admission of the video clips was error, it was harmless in this case. The clips were not a central part of the government’s case; in fact, they took up only three minutes during the nearly five days the government spent presenting its case-in-chief. In addition, the excerpts were shown only once, were not used to frame the government’s case at the trial, and were not unduly emphasized during the government’s arguments to the jury.”); see also McCallum, 584 F.3d at 478. Accordingly, their admission constitutes harmless error.
[[Image here]]
In sum, because the film clips’ minimal probative value is significantly outweighed by the potential for prejudice, the district court abused its discretion in admitting them and in failing to conduct the requisite balancing under Federal Rule of Evidence 403. However, given the overwhelming weight of the evidence against the defendants and the relatively minimal role the film clips played at trial, I find that the error was harmless and I would affirm the convictions. Accordingly, I respectfully concur in the judgment.