*14-1113-cr(L)*
*United States v. Monsalvatge et al.*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2015

(Argued: October 2, 2015      Decided: March 8, 2017)

Nos. 14-1113-cr(L), 14-1139-cr(CON), 14-1206-cr(CON)

———————————————————

UNITED STATES OF AMERICA,

*Appellee*,

-v.-

AKEEM MONSALVATGE,

EDWARD BYAM,

DERRICK DUNKLEY,

*Defendants-Appellants*.

———————————————————

Before:      LIVINGSTON, DRONEY, *Circuit Judges*, and TORRES, *District Judge*.*

Defendants-Appellants Akeem Monsalvatge, Edward Byam, and Derrick Dunkley appeal from their judgments of conviction in the United States District

---

* Judge Analisa Torres, of the United States District Court for the Southern District of New York, sitting by designation.

Court for the Eastern District of New York (Dearie, *J.*), entered on April 10, 2014 in connection with the armed robberies of two Pay-O-Matic check-cashing stores, as well as for conspiracy to commit those robberies. A summary order issued concurrently with this opinion addresses the majority of the claims on appeal. This opinion considers one of Monsalvatge's claims, which Dunkley joins: whether the district court abused its discretion in admitting into evidence clips from the 2010 film *The Town*. We conclude that the movie clips were clearly relevant to establishing that Monsalvatge and Dunkley committed the 2012 robbery and participated in the conspiracy. Further, any potential for prejudice did not outweigh the clips' probative value because the prejudice, if any, was minimal given the clips' extremely short length, the clips' narrow tailoring, and the district court's two curative instructions. We conclude that the district court did not abuse its discretion in admitting the film clips into evidence. For the reasons stated herein and in the summary order filed simultaneously with this opinion, the judgments of conviction as to Monsalvatge and Byam are AFFIRMED. Dunkley's judgment of conviction is AFFIRMED as to Counts One, Four, and Five and REVERSED as to Counts Two and Three. The case is remanded for resentencing as to Dunkley.

JUDGE TORRES concurs in the judgment in a separate opinion.

| FOR APPELLEE: | TYLER J. SMITH, Jo Ann M. Navickas, Tiana A. Demas, Maria Cruz Melendez, Assistant United States Attorneys, New York, N.Y., *for* Kelly T. Currie, Acting United States Attorney for the Eastern District of New York, *for the United States of America.* |
| --- | --- |
| FOR DEFENDANTS-APPELLANTS: | JONATHAN I. EDELSTEIN, Edelstein & Grossman, New York, N.Y., *for Akeem Monsalvatge.* |
| | PATRICK MICHAEL MEGARO, Orlando, Fla., *for Edward Byam.* |
| | DANIEL M. PEREZ, Law Offices of Daniel M. Perez, Newton, N.J., *for Derrick Dunkley.* |

DEBRA ANN LIVINGSTON, *Circuit Judge*:

This is an appeal by three individuals — Akeem Monsalvatge, Edward Byam, and Derrick Dunkley — convicted after a jury trial of committing two armed bank robberies, in violation of 18 U.S.C. § 1951(a), two counts of unlawful use of a firearm during the commission of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii), and conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a). On April 10, 2014, the district court (Dearie, *J.*) sentenced each of the three Defendant-Appellants principally to thirty-two years of imprisonment.

On appeal, Monsalvatge, Byam, and Dunkley raise a variety of claims. This opinion considers one of Monsalvatge's claims, which Dunkley joins: whether the district court abused its discretion in admitting into evidence at trial four clips (lasting a total of one minute and sixteen seconds) from the 2010 film, *The Town*. A summary order filed simultaneously with this opinion addresses the balance of the Defendant-Appellants' claims on appeal. For the reasons stated below and in that summary order, we AFFIRM the judgments of conviction as to Monsalvatge and Byam; and we AFFIRM Counts One, Four, and

3

Five and REVERSE Counts Two and Three of the judgment of conviction as to Dunkley. We remand for resentencing as to Dunkley.

## BACKGROUND

### I. Factual Background[1]

Monsalvatge, Byam and Dunkley were convicted after a jury trial of committing armed robberies of two Pay-O-Matic check-cashing stores and of conspiring to commit these crimes. As set forth below, the two robberies differed in their *modus operandi*. In the first robbery, on February 24, 2010, three bandana-covered men, wielding guns, stole $44,039.73 from a Pay-O-Matic located at 160-30 Rockaway Boulevard in Queens, New York, with one of the robbers gaining access to the protected area of the store by descending through the roof. In the second robbery, on February 14, 2012, almost two years later, three robbers stole $200,755.89 at gunpoint from a Pay-O-Matic located at 247-12 South Conduit Avenue, also in Queens, New York. This time, however, the robbers did not wear bandanas, but rather police-uniform disguises and lifelike "special-effects" masks, and they accosted an employee in gaining access to the store. And unlike in the first robbery, so as to remove any fingerprints or DNA,

---

[1] The factual background presented here is derived from the testimony and evidence presented at trial. References in the form "Gov't Ex. __" herein are to the Government's exhibits.

4

one of the robbers poured bleach on the teller counter. At trial, the Government played three of four *The Town* movie clips admitted by the district court (lasting a total of one minute and seven seconds) for the jury. The Government argued that Monsalvatge was familiar with *The Town* and admired it, and that the co-conspirators altered their *modus operandi* to carry out the second robbery in a manner resembling robberies depicted in the movie.

**A. The February 24, 2010 Robbery**

The first Pay-O-Matic robbery occurred in the early morning hours of February 24, 2010.[2] That morning, Muhammed Hafeez was working as the cashier at the Pay-O-Matic. His workspace, the cashier area, was separated from the counter by a bulletproof-glass divider and two locked doors. Hafeez left to use the restroom, which was located at the back of the store, still behind the secure cashier area. While he was in the bathroom, he heard a crash.

Upon leaving the restroom to investigate the disturbance, Hafeez saw a robber ("Robber 1") holding a gun and standing in the secure cashier area. The crash Hafeez heard occurred when the robber gained entry to the store's secure area by descending through an air duct that had been pried open on the store's

---

[2] A surveillance camera captured the events of the robbery, which transpired between 3:24 and 3:57 a.m. *See* Gov't Ex. 7; *see also* Gov't Ex. 49 (surveillance video stills).

roof, leaving a large hole in the store's ceiling. The robber wore a black hooded sweatshirt with jeans; his face was covered with a black bandana; and he wore blue gloves with white text. The robber aimed his gun at Hafeez, directed him to lie on the floor face down, and handcuffed him.[3]

A second robber ("Robber 2") appeared on the scene in the customer area of the store. Robber 2 also wore jeans and had his face covered but, unlike Robber 1, he wore an orange construction vest with yellow stripes over a blue jacket. In order to confer with Robber 2, Robber 1 left the secure cashier area of the store, with the door locking behind him and leaving Hafeez by himself. The robbers, realizing they were now locked out of the secure cashier area, demanded that Hafeez open the door. Hafeez refused. The robbers attempted to force open the door but failed. At that point, Robber 1 left the store. Robber 2 stayed behind, pointing the gun at Hafeez through the window while making calls on his cell phone.[4]

---

[3] The Government introduced evidence at trial to show that Monsalvatge's DNA was recovered from the handcuffs used on Hafeez and left at the crime scene — evidence that contradicted Monsalvatge's statements to police and to a grand jury that he had not been in contact with handcuffs since 1996.

[4] At trial the Government introduced cellular telephone records that established, *inter alia*, that between 2:04 a.m. and 3:58 a.m. on the morning of the robbery, Monsalvatge and Byam's cell phones exchanged more than 13 calls, all of which were

Robber 1 crashed through the ceiling again, gaining entry to the cashier area. He removed the money from the cashier's drawers and put it in his bag. Robber 2 continued to use his cell phone. At that point, Robber 1 asked Hafeez to open the safe. Hafeez responded that he did not know the combination to the safe. The scene turned violent. Robber 1 began to beat Hafeez with a metal chair. Robber 2 attempted to pass a gun to Robber 1 through a slot in the teller window, but the slot was not wide enough to allow the gun to pass from the customer area, where Robber 2 stood, to the cashier area, where Robber 1 stood. Robber 2 made another phone call.

Soon, a third robber ("Robber 3") entered the store. Robber 3's appearance was not clearly captured on the surveillance footage. He wore dark clothing, a dark jacket, and dark pants. In the store lobby, Robber 3, who had a gun, switched his weapon with Robber 2. Robber 2 handed the apparently slimmer gun to Robber 1 through the slot in the teller window. Robber 3 left the store.

Robber 1, now again armed, questioned Hafeez about the safe, asking him who would know the combination if not him. When Hafeez told Robber 1 that

---

routed through a cell phone tower located just one block away from the Rockaway Boulevard Pay-O-Matic.

his supervisor had the combination, Robber 1 demanded that Hafeez call the supervisor, which Hafeez did. Hafeez's supervisor, however, would not give Hafeez the combination to the safe. After that unsuccessful call, Robber 1 threw Hafeez's cell phone into one of the drawers. Robber 1 told Hafeez to move to the restroom. While Hafeez was in the bathroom, Robber 1 left the store using the emergency exit, and Robber 2 left through the front door. The robbers absconded with $44,039.73.

**B. The February 14, 2012 Robbery**

As already noted, the second robbery occurred almost two years later, on February 14, 2012, also at a Queens Pay-O-Matic.[5] At 7:56 a.m., a black Ford Explorer SUV pulled into the parking lot of the Pay-O-Matic check-cashing store on South Conduit Avenue in Queens. What appeared to be a bag covered a damaged right rear window of the SUV, which also bore a distinctive dent on the front passenger side of its bumper. Fifteen minutes later, just past eight o'clock in the morning, Liloutie Ramnanan, a teller at the Pay-O-Matic, drove her car into the parking lot. Ramnanan saw three people in the SUV. As Ramnanan walked toward the store and passed the vehicle, the three stepped out of the car.

---

[5] A surveillance camera captured the events of this robbery as well. *See* Gov't Ex. 4; *see also* Gov't Ex. 2 (surveillance video stills).

8

They appeared to be white- or light-skinned men. All three men, however, also appeared to have brown lips. Ramnanan assumed they were law enforcement officials because they wore police attire: blue police jackets with hoods (bearing the police shield on the left side of the chest), police badges, and sunglasses. Two men wore baseball caps, but one did not—the third who did not wear a baseball cap appeared to be a bald man with a goatee.[6]

The goateed man suddenly approached Ramnanan, stopped her, and asked whether she worked at Pay-O-Matic. Ramnanan responded that she did. At that point, he pulled out three papers with photographs of houses on them. According to Ramnanan, he showed her one of the photographs, and asked whether she "kn[ew] this photo of this house." Joint App'x 701. She answered, yes, recognizing the house in the photograph as her own.[7] He then

---

[6] The Government adduced testimony at trial from the owner of a special-effects mask manufacturing company who explained that the robbers wore lifelike masks and that he had sold three such masks to Byam in October 2011.

[7] Surveillance footage of the robbery in progress depicted one of the robbers later dropping an item which turned out to be the photo of Ramnanan's house. It was stamped "Walgreens" on the back side, and bore both a store number and the date "12-3-11." Subsequent investigation revealed that this particular Walgreens was near Byam's residence, and that a "Byam, E.," providing a telephone number that matched Byam's, had placed the photograph order. Surveillance video from the pharmacy depicted Byam dropping something off at the photograph counter on December 3, 2011, and picking something up later that day.

asked her who was inside the store and Ramnanan realized, "this is a hold up."

*Id*.

The goateed man directed Ramnanan to walk inside the store. Inside, there were two other people: a customer and the outgoing overnight teller named Sean Anderson. Anderson stood in a secured teller area. That area was protected by bulletproof glass and separated from the lobby by two doors that could be unlocked only from the teller area. Anderson noticed that the men wore gloves and that one of the pairs of gloves was blue with white text. The goateed man, upon entering the store, demanded that Anderson open the door. Anderson obliged, and the goateed man directed Ramnanan along with the two other robbers inside that space.

Inside the teller area, one robber emptied a safe and put the money into a black bag. The other robber demanded at gunpoint that Anderson and Ramnanan lie down on the floor. The armed robber emptied the teller drawers and splashed the teller counter with a liquid that smelled like bleach.[8] The three

---

[8] Police later recovered an empty juice bottle at the scene that still smelled of bleach. Both Ramnanan and Anderson testified that their apparel was splattered with the liquid during the crime, causing the clothing items, where splattered, to turn white.

robbers then left the Pay-O-Matic with the cash, driving off in the SUV.[9]  In total, the robbers stole $200,755.89.

Bank records showed that thousands of dollars of cash were deposited into Dunkley's account shortly after the February 14, 2012 robbery.  Monsalvatge opened a new account on February 15, and shortly thereafter made several large cash deposits.  Within months, Monsalvatge and Byam also took a trip to Cancun.  Records show, and employees from various luxury goods retailers testified, that each of the defendants spent thousands of dollars on high-end goods during the spring and summer of 2012.

\*    \*    \*

On August 21, 2012, Monsalvatge was arrested pursuant to an arrest warrant.[10]  Shortly thereafter, Byam, while in his apartment, was also arrested pursuant to a warrant.  Upon arrival, the arresting officers brought Byam into

---

[9] By checking addresses associated with Byam's family and friends, investigators later located the SUV, with both the damaged rear window and the dent, in the driveway of a house in Queens.  Police officers inspected the vehicle, but the SUV was thereafter sold to a scrap yard and destroyed when police did not seize it.  Byam's girlfriend testified at trial that the car was given to her by her stepfather and that Byam had keys to the car and used it.  She also testified that she instructed Byam to get rid of the car after learning that police had examined it.

[10] Monsalvatge was driving at the time of his arrest and, from the car, the police seized a pair of work gloves, a police scanner, and Monsalvatge's cell phone.

11

the apartment building hallway and proceeded to conduct a protective sweep of the apartment.[11]   The next day, Derrick Dunkley purchased a bus ticket from New York City to Hartford, Connecticut.   Approximately one month later, law enforcement officers located and arrested Dunkley at his aunt's house in Hartford.[12]

---

[11] The police seized the following: a partially completed Pay-O-Matic employment application, which bore Byam's name and address; a black bag (believed to be a "robbery bag") that was later found to contain a mask, walkie-talkies, a bottle of bleach, and photographs; and a small cloth bag that was later found to contain a BB gun.

Later, during the pre-trial proceedings, Byam moved to suppress this evidence as the fruit of an unlawful search.   The district court found that the agents were lawfully in Byam's apartment and were justified in conducting a protective sweep.   The district court concluded, however, that "the protective sweep got out of hand" and suppressed all of the evidence seized from Byam's apartment with one exception: the Pay-O-Matic application, which, the district court found, had been in plain view and was "immediately recognized by one of the agents."   Joint App'x 393-94; *see also* Gov't Ex. 73.

[12] During a consensual search of the residence, the officers seized a laptop computer, identification cards, credit cards, a hat, safe deposit box keys, documents, and two cell phones.   A search of Dunkley's computer showed multiple recent Internet searches about the federal criminal justice system.   Specifically, Dunkley searched for information relating to the following questions and phrases: "Does a subpoena mean you're under arrest?"; "If evidence used in a federal court case was on your property can you be held?"; "Evidence against you on someone else's property"; and "Process it takes to bring someone to trial for federal crime."   Joint App'x 2264-68.   A search of Dunkley's computer also uncovered a search for "NYPD jackets."   *Id.* at 2267.

## II. Procedural History

On January 4, 2013, a grand jury indicted Monsalvatge, Byam, and Dunkley, charging each of them with Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951(a) (Count One); Hobbs Act robbery on February 24, 2010, in violation of 18 U.S.C § 1951(a) (Count Two); unlawful use of a firearm in a crime of violence in connection with the February 24, 2010 robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Count Three); Hobbs Act robbery on February 14, 2012, in violation of 18 U.S.C § 1951(a) (Count Four); and unlawful use of a firearm in a crime of violence in connection with the February 14, 2012 robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Count Five).

### A. Pre-Trial Proceedings

The district court considered a number of motions in advance of trial. As relevant here, the Government filed a motion *in limine* concerning *The Town*, a 2010 crime drama about a group of Boston bank robbers.[13] The robberies in the film bore certain similarities to the charged 2012 robbery, and the Government had evidence that at least one of the defendants had seen and admired the film.

---

[13] THE TOWN (Warner Bros. Pictures 2010). *The Town*, released on September 17, 2010, is based on Chuck Hogan's 2007 book *Prince of Thieves*. Ben Affleck directed, co-wrote, and starred in the film. The film grossed more than $154 million at the box office, and Jeremy Renner earned an Academy Award nomination for Best Supporting Actor for his performance.

In its motion, the Government requested to play for the jury at trial film clips from *The Town*. These clips would serve "as evidence regarding the genesis of the defendants' modus operandi in the 2012 robbery and to explain the change in modus operandi between robberies committed in 2010 and 2012." Joint App'x 406.

The first clip ("Clip 1") is nine seconds long. *See* Gov't Ex. 79 (Clip 1). It begins by showing two investigators outside a Harvard Square bank that has been robbed. They both wear navy-blue jackets, one with a hood. One, in bold letters, reads "POLICE" on the back, while the other reads "FBI." The labels "POLICE" and "FBI" appear in smaller letters on the front, left sides of the jackets as well. As they enter the crime scene, the police investigator tells the FBI agent that the perpetrators had "bleached the entire place for DNA," which "kills all the clothing fibers so [the investigators] can't get a match." *Id.* at 0:05-0:09.

The second clip ("Clip 2") is nine seconds long. *See* Gov't Ex. 79 (Clip 2). There are a number of robbers — four, it seems — who wear black hooded sweatshirts and elaborate masks. The masks depict blue skulls with hanging blue dreadlocks. For one second, one of the robbers is shown to be holding an

14

assault rifle[14] — but only the butt of the gun appears, because the rest of it is cropped at the bottom of the frame. *Id.* at 0:01. The *mise-en-scène* is difficult to absorb in nine seconds, but the mood is tense: in the midst of the robbery, the perpetrators realize there are people gathering outside the bank doors. One robber says, "We gotta go." *Id.* Another yells, "Let's go!" *Id.* at 0:02. For two seconds, the robber holding the weapon runs across the frame — the firearm is visible, but blurred by the movement. A robber yells, "Let's bleach it up! Let's bleach it up!" *Id.* at 0:04-0:06. The robbers then pour bleach on the bank teller's counter as the clip ends.

The third clip ("Clip 3") is twenty-one seconds long. *See* Gov't Ex. 79 (Clip 3). The scene opens with a closely framed image of one of the robbers, played by Ben Affleck, who appears stern. He is sitting in the second row of a van with the other robbers as they drive through the North End neighborhood of Boston. They are on their way to commit a robbery. A police scanner discloses the location of the authorities to the robbers. The driver advises the rest of the group, "Say your prayers; here we go." *Id.* at 0:08-0:09. At that point, the

---

[14] Both the Government and Monsalvatge characterize this weapon as an "assault rifle." We understand, however, that this is a technical term, and we do not have any authoritative source that indicates the particular kind of weapon the fictional scene seeks to invoke. Nevertheless, for ease of reference, we adopt the parties' terminology herein.

robbers, beginning with Affleck's character, put on masks which disguise them as elderly nuns. These masks show excessively wrinkled, sagging skin. The masks have holes for the robbers' real eyes and mouths — through which the audience can see a bit of the robbers' actual skin. For the final four seconds of the clip, the audience sees a robber through the van's window. The robber is now masked as an older nun and holding an assault rifle. Only the top half of the weapon is visible.

The fourth and final clip ("Clip 4") is thirty-seven seconds long. *See* Gov't Ex. 79 (Clip 4). This scene shows one of the robbers dressed as a police officer, knocking on the door of the "cash room" at Fenway Park. He wears a dark-blue jacket (bearing the police department crest on the shoulder), a cap, a face scarf or bandana, and sunglasses. On the left side of the front of the jacket, the robber wears a police badge. He knocks on the locked door of the secured cash room. He reveals to the employees on the other side that he knows their home addresses and family members' names, and that there are "men outside [their] homes." *Id.* at 0:28-0:31. Their wives, the robber advises, would want them to open the door. They do so, and the robber walks through the threshold pointing a handgun.

The Government sought to admit the film clips as relevant because, given the similarities between the actions depicted in these scenes and the February 2012 robbery, the clips helped to explain why the 2010 and 2012 robberies had proceeded differently. The similarities included: (1) pouring bleach on the bank surfaces; (2) threatening an employee by revealing knowledge of the employee's home address; (3) wearing police badges, uniforms, and sunglasses; and (4) wearing masks. In connection with its motion, the Government submitted an iPhone photograph that showed Monsalvatge standing next to Byam and wearing a t-shirt with a silk-screened image of one of the masked robbers from Clip 3 of *The Town*. The Government also included text messages showing that Monsalvatge had designed and custom-ordered the t-shirt at a mall.[15] Dunkley and Byam each raised a Federal Rule of Evidence 403 objection in their papers opposing the Government's motion *in limine*. The district court granted the Government's motion to admit the evidence. In doing so, the district court explained that it had "looked at the clips" and noted that Monsalvatge had "a T-shirt . . . depicting a particular still scene from th[e] movie." Joint App'x 643.

---

[15] *See* Gov't Ex. 120 (text message of Mar. 30, 2012, five weeks after the second robbery) ("Imma try n make it da mall 2 day so 4 da fly t it's black wit white sleeves. N 4 da nun white wit da black sleeves.").

On that basis, the district court "underst[ood]" the Government's theory and granted the motion.   *Id.*

**B. Trial Proceedings**

The trial began on July 30, 2013.   As part of the extensive proof at trial, which included both surveillance footage of the two robberies and testimony from Hafeez, Ramnanan, and Anderson, the Government introduced evidence that all three defendants had frequented Pay-O-Matic cash-checking stores during the period of the alleged conspiracy and that each defendant's cell phone records showed a flurry of communications among the defendants surrounding

each of the robberies.[16]   Montsalvatge's cell phone also contained photographs and incriminating text messages among the three defendants.[17]

Specifically as to the February 24, 2010 robbery, the Government introduced forensic evidence showing that Monsalvatge's DNA was found on the handcuffs used on Hafeez.   Specifically as to the February 14, 2012 robbery, the Government adduced testimony from digital retailers and manufacturers regarding the defendants' purchase of law enforcement paraphernalia and lifelike masks worn during the robbery.[18]

---

[16] The summary order published in tandem with this opinion details the phone calls exchanged between all three phones surrounding the February 24, 2010 robbery.

[17] Some of the text messages between the three defendants referenced wealth and included images of money and various luxury goods.   Other text messages, particularly those sent in the month following the 2012 robbery, featured more incriminating language.   *See* Joint App'x 2306 ("Start getting y'alls mind back on work and excellent execution so we can be rich forever, rich forever."); *id.* at 2305 ("[Y]ou passed the steal balls tst [sic]. You have the smarts and you are open to advice.   If you stay disciplined, dedicated, desire, and respect what you do, I guarantee you will be a multimillionaire by the time you are 25, fact."); *see also* Gov't Ex. 122 (text messages between defendants).   Particularly of note is a March 14, 2012, text message from Byam to Monsalvatge that states: "[T]hey taking DNA for misdemeanors now, shit crazy," to which Monsalvatge responded, "[B]leach is a niggas best friend."   Joint App'x 2306; *see also* Gov't Ex. 122.

[18] A retailer testified that on November 19, 2011, an online user purchased three NYPD navy-blue rain jackets that were hooded, zippered, and had an police department shield and read "NYPD" on the chest.   The jackets were shipped to "Derrick Dunkley" at Dunkley's residence.   Another digital retailer testified that

19

At trial, the Government introduced the four clips from *The Town* into evidence, which the district court admitted over objections by all three defendants. The Government then played three of the four clips for the jury. Before playing the clips, the district court provided an instruction to the jury: "Folks, this is a movie, all right. It's make believe. Anything that you hear on this movie is not before you for the truth of it. This is Hollywood and not Brooklyn federal court, so we'll leave it at that for the time being." Joint App'x 1075. A Government witness, an investigating detective, highlighted aspects of the clips as they were played for the jury.

The Government began by playing Clip 2 — the nine-second-long excerpt depicting the robbers pouring bleach on the counter — for the jury. After

during the same month he sold three leather NYPD-style badge holders to a user who had Dunkley's address associated with the account.

The owner of a lifelike special-effects masks manufacturing company testified that Byam had purchased three special-effects masks from his company on October 25, 2011. The masks were marketed as "Mac the Guy" masks with eyebrows, and one also had a goatee. Byam purchased the masks with a prepaid credit card, and the masks were ordered and delivered to the address of Monsalvatge's girlfriend, with whom Monsalvatge lived. Byam later e-mailed the manufacturer, stating that he was "extremely pleased" with the masks and asked for guidance about how to wear them.

At the Government's request, the company manufactured a "Mac the Guy" mask to the same specifications as the goateed mask Byam ordered. The company's owner modeled it for the jury. Significantly, the owner testified that a person's real lips are sometimes visible when wearing the mask. Last, he testified that, when he reviewed surveillance photographs from the 2012 robbery, he could tell that one of the robbers was wearing a "Mac the Guy" mask with a goatee.

playing the clip, the witness described the clip as showing "the perpetrators robbing a bank and in th[e] container it contained bleach and they are pouring it by the drawers and the teller area where they possibly touched." *Id.* at 1076.

Next, the Government played Clip 4 for the jury. This thirty-seven-second-long excerpt showed, as the witness testified, a perpetrator dressed as a police officer revealing to the employees that he knew personal details about their lives. The witness explained that the character "knew [the employees'] routines, he knew who their family were. He basically threatened them if they were going to make a distress call, that their family would get called." *Id.* at 1077.

Last, the Government played Clip 3 for the jury. This twenty-one-second-long clip showed the robbers in a van with two of them putting on a lifelike mask as part of a nun disguise. In conjunction with this clip, the Government introduced into evidence the photograph of Monsalvatge wearing a t-shirt that depicted the image from that scene: the robber wearing the lifelike nun mask. Byam is standing next to Monsalvatge in the photograph. The Government later introduced into evidence text messages indicating that Monsalvatge had custom-ordered the t-shirt at a mall.

21

In total, the Government played one minute and seven seconds of *The Town* for the jury. The next day, the Government requested that the district court provide the jurors an additional instruction regarding the movie clips. It asked that the district court instruct the jury that "there were [no] actual people outside of . . . Ramnanan's home as was stated in the film and that the weapons that were used in the particular robbery shown in the clip were large assault-like weapons. And that there's no contention here that those types of weapons were used in the robbery." *Id.* at 1230. The robbers on trial, the Government explained, used semiautomatic pistols. The Government sought this additional instruction "[j]ust for the sake of making sure that there's no confusion." *Id.* Later that day, the district court provided the additional instruction the Government had requested:

> [L]et me take you back to yesterday for just a moment. You will recall, I think it was yesterday, you saw clips from a movie. The movie is entitled . . . "The Town." During those clips you may have noticed that actors were using these very fierce-looking assault weapons. There is no evidence in this case nor is there an allegation in this case that such weapons were used; I want to make sure you understand that. There is also a scene that you may have noticed where the claim was that the perpetrators of the crime had somebody outside the house of some of the victims during the course of the crime; again, no such allegation in this case, and you'll hear no proof to that effect in this case. I just want to make sure there is no misunderstanding.

22

*Id.* at 1307.

With that, the film clips were not mentioned again until summations, when the Government described for the jury the different techniques the robbers had used in the second robbery and stated, "we have an idea where they got those techniques." *Id.* at 2426. The Government explained:

> You saw clips from a movie, The Town. You saw criminals being portrayed in that movie pouring bleach on surfaces to destroy DNA, using police uniforms, using a knowledge of victim's homes to make sure that people would do what they wanted them to do. In one of those clips you hear a police scanner, so they can keep track of whether law enforcement is responding.
>
> Now, we know the defendants knew about that movie. Akeem Monsalvatge had a shirt depicting one of the scenes we watched, a shirt that he had made, an inside joke. But how did the techniques line up? They used bleach during their robbery. You recall the video, one of them clearing out the cash drawers and pouring the bleach from a bottle he had brought with him. We know it was bleach. The victim said it smelled like bleach. When it got on their clothing it created white spots.
>
> And we saw this text message yesterday, from Edward Byam to Akeem Monsalvatge, they taking DNA for misdemeanors now, shit crazy. Then the response, that bleach, it's N-I-G-G-A-S best friend. Keep in mind when Akeem Monsalvatge was sending that text message he had already been arrested for the 2010 robbery. He had already been told that his DNA was found at the scene. He certainly thinks bleach would be his best friend.
>
> What about the police uniforms? Yeah, they did that too. Knowledge of a victim's home, a threat that everyone would understand, they know where I live. What about the police scanner? You can see it here in his hands. And you can see it here

in Government Exhibit 62, seized from Akeem Monsalvatge, and when it was seized what station was it set to, fire and police.

*Id.* at 2426-28.

During Monsalvatge's summation, his counsel sought to diffuse the Government's theory that *The Town* accounted for the robbers' change in *modus operandi*. He told the jury that "[w]hen you look at the February 24th, 2010 robber, it's like the Three Stooges, these guys don't know what they are doing, they get locked out. They are coming through the ceiling twice. . . . And they are saying these three guys, that's the team from 2010." *Id.* at 497. By contrast, the February 24, 2012 robbers appeared to be a "well[-]oiled machine," escaping in three minutes with more than $200,000. *Id.* Incredulously, he concluded, "But you know what the key is, the key is they saw the movie The Town, so they got it all right."[19] *Id.* at 2498.

The district court proceeded to charge the jury. After deliberations, the jury returned guilty verdicts against each of the three defendants on all five

---

[19] Separately, counsel for Dunkley, in his summation, emphasized that there was no evidence that Dunkley had seen *The Town*. Dunkley's counsel told the jury that the Government was "suggest[ing] that this bumbling pack of robbers in 2010 all of a sudden become [sic] this incredibly sophisticated group of robbers because they have seen a movie. If that's the case, you can just watch a movie about brain surgery tomorrow and, you know, perform a flawless brain surgery on Saturday." Joint App'x 2526. Byam's counsel in his summation claimed that the Government used the movie clips to "dress[] the case . . . up." *Id.* at 2474.

counts. On April 4, 2014, the district court sentenced each defendant to thirty-two years of imprisonment, five years of supervised release, $240,795.62 in restitution, and a $500 special assessment.

## DISCUSSION

We review a district court's evidentiary rulings over objection for abuse of discretion. *United States v. Cuti*, 720 F.3d 453, 457 (2d Cir. 2013). We review such rulings deferentially, "mindful of [a district court's] superior position to assess relevancy and to weigh the probative value of evidence against its potential for unfair prejudice." *United States v. Abu-Jihaad*, 630 F.3d 102, 131 (2d Cir. 2010); *see also* 11 Wright & Miller, Federal Practice and Procedure § 2885 (3d ed. 1998) (describing a district court's "wide and flexible[] discretion" in "questions of admissibility of evidence"). Indeed, "[w]e will reverse an evidentiary ruling only for 'abuse of discretion,' which we will identify only if the ruling was 'arbitrary and irrational.'" *Abu-Jihaad*, 630 F.3d at 131 (citation omitted) (quoting *United States v. Dhinsa*, 243 F.3d 635, 649 (2d Cir. 2001)).

At issue here is the district court's admission of the movie clips from *The Town* into evidence. On appeal, Monsalvatge, joined by Dunkley, contends that the district court abused its discretion in admitting these clips into evidence and

allowing the Government to play three of them — lasting a total of one minute and seven seconds — for the jury.   For the following reasons, we disagree.

*     *     *

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and if "the fact is of consequence in determining the action."   Fed. R. Evid. 401; *see also Abu-Jihaad*, 630 F.3d at 131.   "Evidence need not be conclusive in order to be relevant." *United States v. Schultz*, 333 F.3d 393, 416 (2d Cir. 2003) (quoting *Contemporary Mission v. Famous Music Corp.*, 557 F.2d 918, 927 (2d Cir. 1977)).   A district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."   Fed. R. Evid. 403.   But in reviewing a district court's Rule 403 ruling, we "generally maximiz[e] [the evidence's] probative value and minimiz[e] its prejudicial value."   *United States v. LaFlam*, 369 F.3d 153, 155 (2d Cir. 2004) (per curiam) (first and third alterations in original) (quoting *United States v. Downing*, 297 F.3d 52, 59 (2d Cir. 2002)).

Here, the district court properly concluded that the clips were, indeed, relevant under Federal Rule of Evidence 401. *See Schultz*, 333 F.3d at 416 (noting that "[d]eterminations of relevance are entrusted to the sound discretion of the trial judge"). The clips, in conjunction with other evidence, tended to make more probable the factual inference that the 2010 and 2012 robberies (which otherwise bore few similarities in *modus operandi* beyond the number of robbers and the choice of targets) were part of the same conspiracy. The 2010 robbery, as Dunkley's counsel pointed out, was clumsily committed by a "bumbling pack of robbers" who gained entry to the Pay-O-Matic by descending through the ceiling. Joint App'x 2526. In contrast, the 2012 robbery was swiftly and efficiently executed in a matter of minutes by robbers who accosted a store employee. More importantly, the second robbery bore a different set of characteristics: namely, the use of disguises — police uniforms — and lifelike special-effects masks, along with bleach to ensure the robbers left behind no trace of DNA. The *The Town* clips (along with evidence that at least Monsalvatge and Byam were aware of the movie and that Monsalvatge admired it sufficiently to have a t-shirt specially made to depict a *The Town* scene) helped to show that the

27

defendants' *modus operandi* changed because they decided to incorporate ideas from the movie into their method for committing robberies.

In February 2010, when the first robbery occurred, *The Town* was still seven months away from its wide-release date. But, by the second robbery in February 2012, the film had long been available to the public. The 2012 robbery bears a remarkable — even obvious — resemblance to multiple aspects of the clips from *The Town*. In fact, nearly every distinctive aspect of the 2012 robbery can be traced to the film. The robbers' disguises, with minor differences, appear to combine the navy-blue police jacket with a hood and text detail on the front left side of the jacket in Clip 1 and the sunglasses and badge in Clip 4. The idea for special-effects masks imitating real skin is in Clip 3. The idea to use bleach to eliminate traces of DNA is in Clip 2 (and the effects of using bleach are explained in Clip 1). Threatening an employee by revealing knowledge of a home address is in Clip 4. That is every key facet of the 2012 robbery. Taken individually, each of these elements might not be sufficiently distinctive to raise a connection to the film. But taken together, as they occurred here, the attributes of the 2012 robbery are clearly connected to the film.

Government Exhibits 99 and 120 make that connection even sharper. The Government submitted an iPhone photograph that showed Monsalvatge standing next to Byam and wearing a t-shirt with a silk-screened image of one of the masked robbers from *The Town* — specifically, a still frame of the nun-costumed robber in Clip 3. *See* Gov't Ex. 99. And this was not an ordinary t-shirt that a fan might purchase at a retail store. Rather, the Government also introduced evidence to show that Monsalvatge designed and custom-ordered this t-shirt. *See* Gov't Ex. 120. This would have been a distinctive sartorial choice for Monsalvatge at the time. The Government adduced testimony at trial from employees of luxury good retailers — including Fendi, Gucci, Ralph Lauren, Christian Louboutin, and Louis Vuitton — that the defendants spent thousands of dollars at these stores during the spring and summer of 2012. Despite this apparent taste for *haute couture*, Monsalvatge, in March 2012, approximately five weeks after the second robbery, went to the mall and custom-ordered a t-shirt depicting a scene from *The Town*. He later posed with Byam for a photo wearing that shirt.

Monsalvatge states, in conclusory fashion, that the clips are prejudicial. But he does not show how any potential for prejudice arising from the

introduction of these clips outweighed their evident probative value. Monsalvatge does not even identify any specific prejudicial potential that these clips carried beyond the fact that they "invited the jury to speculate that this was a copycat crime." Monsalvatge Br. 48. It is unclear — and Monsalvatge does not explain — what effect characterizing the robbery as a copycat crime would have on the jury.

In any event, the movie clips here do not have the sort of "strong emotional or inflammatory impact" that would "pose a risk of unfair prejudice because [they] 'tend[] to distract' the jury from the issues in the case and . . . [might] arouse the jury's passions to a point where they would act irrationally in reaching a verdict." *United States v. Robinson*, 560 F.2d 507, 514 (2d Cir. 1977) (quoting Fed. R. Evid. 404 advisory committee note). First, they are very short. Two clips last nine seconds, one lasts twenty-one seconds, and another lasts thirty-seven seconds. They are so short because they are narrowly tailored to show *only* the parts of the movie that are relevant to the 2012 robbery. The clips depict no violence: the robbers do not hurt anyone on the screen. Granted, the robbers do carry assault rifles in two of the clips, but those firearms appear for a total of only seven seconds (in Clip 2, for one and two seconds, and, in Clip 3, for

30

four seconds). Further, in each instance, the weapons are either partially cropped by the frame or blurred by the action. In the little dialogue that occurs in the clips, moreover, the robbers appear to be the film's protagonists.[20] With all this in mind, it is difficult to see how these clips could "unfairly . . . excite emotions against the defendant[s]." *United States v. Massino*, 546 F.3d 123, 133 (2d Cir. 2008) (per curiam) (quoting *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980)).

Critically, moreover, the district court took steps to minimize any potential for prejudice that might exist. First, the district court gave not one but two curative instructions. It initially instructed the jury: "Anything that you hear on this movie is not before you for the truth of it." Joint App'x 1075. The next day, the district court further instructed the jury about two differences between the 2012 robbery and the movie clips. It explained: "There is no evidence in

---

[20] More broadly, for anyone who saw this popular movie, the robbers in the movie are classic anti-heroes: they might break the law, but they are nevertheless the film's protagonists and sympathetic characters. *See, e.g.*, Anthony Lane, *Actor's Dilemma: "The Town" and "Jack Goes Boating,"* NEW YORKER, Sept. 20, 2010, at 120, 120-21 ("Affleck . . . plays the hero, Doug MacRay . . . . Affleck the movie director makes you truly, badly want his bunch of ne'er-do-wells to pull off their heists without a scratch, and you can't ask for much more than that."); A.O. Scott, *Bunker Hill to Fenway: A Crook's Freedom Trail*, N.Y. TIMES, Sept. 16, 2010, at C2 ("The life of crime is the only one [Ben Affleck's character] knows, and he is good at what he does, but there are broad hints — well, O.K., blazing neon signs — that his heart is no longer in it.").

this case nor is there an allegation in this case that [assault weapons] were used; I want to make sure you understand that." *Id.* at 1307. The district court also noted that in the film "the perpetrators of the crime had somebody outside the house of some of the victims during the course of the crime; again, no such allegation in this case, and you'll hear no proof to that effect in this case." *Id.* The district court clarified that it had provided this second instruction "to make sure there [was] no misunderstanding." *Id.* As we have made clear, "[a]bsent evidence to the contrary, we must presume that juries understand and abide by a district court's limiting instructions." *Downing*, 297 F.3d at 59. There is no evidence suggesting otherwise in this case.

This Court has in the past declined to second-guess a district court's admission of relevant video or media evidence where the evidence bears an identifiable connection to an issue or defendant in the case. *See, e.g.*, *United States v. Cromitie*, 727 F.3d 194, 225 (2d Cir. 2013) (finding that a district court was "well within [its] discretion" in admitting into evidence a twenty-second-long video of a demonstration explosion set off by a bomb that was "constructed with the type and amount of material that the defendants thought was in the fake devices they were planning to use in the operation"); *Abu-Jihaad*, 630 F.3d at

131-35 (affirming the district court's admittance of various website materials —

including pro-jihadist videos and Osama bin Laden's 1996 *fatwa* against the

United States — on the theory that they were relevant to the understanding the

operations at issue in the case, despite the materials' potential to inflame a juror's

passions); *United States v. Salameh*, 152 F.3d 88, 111 (2d Cir. 1998) (per curiam)

(affirming the district court's ruling to admit a videotape that "showed a man

driving a truck into a building that was flying an American flag" and then the

building exploding because "[t]he videotape . . . closely resembled the actual

events at the World Trade Center and provided further evidence of motive and

intent," and the district court was within its discretion to find that this

"significant probative value . . . was not substantially outweighed by the danger

of unfair prejudice" — namely, "[t]he sulphurous anti-American sentiments

expressed in the terrorist materials[, which] no doubt threatened to prejudice the

jury against the defendants").  To that end, our rulings have been in line with

those of our sister circuits.[21]   We see no reason to depart from this precedent in

---

[21] *See, e.g., United States v. Schneider*, 801 F.3d 186, 199-200 (3d Cir. 2015) (affirming district court's evidentiary ruling in prosecution for traveling in foreign commerce with intent to engage in sex with a minor to admit excerpts from the film, *Nijinsky*, which showed a famous ballet dancer and his older patron and lover, because the victim testified that the defendant had shown him the film); *United States v. Smith*, 749 F.3d 465, 495-96 (6th Cir.) (holding that, in a trial on mail fraud charges arising from a scheme to

the circumstances here, where the movie clips in question had real probative value and the potential for prejudice, we conclude, was slight.

* * *

In sum, the district court's ruling to admit the movie clips from *The Town* into evidence was not arbitrary and irrational. The clips were relevant to the issues and defendants in the case and, importantly, they were short and narrowly tailored. Further, the district court provided not one but two curative instructions to minimize any potential for prejudice from the few differences between the clips and the 2012 robbery. It made clear — if it was not clear enough already — that the clips represented "Hollywood and not Brooklyn federal court." Joint App'x 1075.

---

defraud investors, the district court did not err in admitting clips from the movie *The Boiler Room* that depicted salesmen deceiving potential investors, where former employees of the defendants' company testified that the movie was provided to employees for training purposes), *cert. denied*, 135 S. Ct. 307 (2014), *reh'g denied*, 135 S. Ct. 1034 (2015); *United States v. Jayyousi*, 657 F.3d 1085, 1108 (11th Cir. 2011) (affirming the district court's ruling, in terrorism case, to admit a seven-minute-long portion of a 1997 CNN interview with Osama Bin Laden to which the alleged co-conspirators had briefly referred in intercepted phone calls); *United States v. Wills*, 346 F.3d 476, 489, 497 (4th Cir. 2003) (affirming the district court's ruling to admit clips from the movie *Casino* as relevant to help explain a reference the defendant made during a tape-recorded conversation). *But cf. United States v. Gamory*, 635 F.3d 480, 493-94 (11th Cir. 2011) (ruling that the district court abused its discretion in admitting into evidence a rap video in which the defendant appeared in light of its minimal probative value, that it contained inadmissible hearsay statements, and that "[t]he lyrics presented a substantial danger of unfair prejudice because they contained violence, profanity, sex, promiscuity, and misogyny," but concluding that this was harmless error in any event).

34

Our courtrooms are not movie theaters. But we cannot assume that our jurors — whom we routinely ask to pore over the violent and often grisly details of real crimes — are such delicate consumers of media that they would so easily have their passions aroused by short film clips of the sort at issue here. In this case, the district court acted well within its discretion in permitting the jury to see one minute and seven seconds of relevant Hollywood fiction during the course of a four-day criminal trial in real-life Brooklyn federal district court.

For the foregoing reasons, we **AFFIRM** the judgments of conviction as to Monsalvatge and Byam. As to Dunkley, we **AFFIRM** as to Counts One, Four, and Five, and, for the reasons stated in the summary order accompanying this opinion, we **REVERSE** as to Counts Two and Three. The matter is remanded for resentencing as to Dunkley.

TORRES, *District Judge*, concurring in the judgment:

With respect to the bulk of the issues on appeal, I join the summary order issued concurrently with this opinion. I write separately, however, because I disagree with the majority's conclusion that the district court did not abuse its discretion in admitting into evidence excerpts from the movie *The Town*. Because, however, the admission of the clips constituted harmless error, I respectfully concur in the judgment.

\*     \*     \*

The facts are set forth in the majority opinion and need not be recounted in detail. However, it is worth examining more closely the three movie clips shown to the jury and the Government's justifications for admitting each.

The Government first played Clip 2—a scene from the movie *The Town* depicting a bank robbery under way. *See* Gov't Ex. 79 (Clip 2). Clip 2 begins inside the bank with a close-up of a robber carrying what appears to be a submachine gun and wearing a skeletal Grim Reaper mask with a hooded black overcoat. As one voice shouts, "We gotta go," the robber's gaze shifts to the bank's opaque glass front door, where a silhouette on the street walks by. Another voice yells "Let's Go!" as the music swells with a cymbal roll and a thundering drum beat. The film then cuts to three robbers in the teller area—also carrying assault rifles and dressed as the Grim Reaper. A voice exclaims, "Let's bleach it up!" The robbers then pass around a large white plastic bottle and hastily pour a liquid—presumably bleach— on the tellers' workstations. In the background, three hostages sit on the floor. The excerpt features swift cutting, with six shots in the nine-second excerpt.

After playing the clip, the Government witness, a detective who had just finished testifying about the processing of fingerprint and DNA evidence, explained to the jury that the

1

excerpt shows "the [film's] perpetrators robbing a bank and in that container it contained bleach and they are pouring it by the drawers and the teller area where they possibly touched."  J.A. at 1076.

The Government then played Clip 4.  *See* Gov't Ex. 79 (Clip 4).  Clip 4 depicts a man outside of a locked room.  He is carrying a handgun and is dressed in a police uniform.  A black cloth covers all but his eyes and ears.  Dark sunglasses obscure his eyes.  Using the gun, he pounds on a locked door and shouts to get the attention of two middle-aged, male employees in "the cash room."  He proceeds to identify the men, announcing their names, home addresses, and wives' names.  He warns them not to call for help and to open the door, yelling "we have men outside your homes."  The camera cuts to a close-up of their anxious faces and dramatic music highlights the tension of the situation.  The robber is buzzed in, he enters the cash room, and points his gun at an employee's head.

After the clip was played, the detective noted that the perpetrator "was dressed as a police officer" and explained to the jury that the robber "knew their routines, he knew who their famil[ies] were.  He basically threatened them if they were going to make a distress call, that their family would get hurt."  J.A. at 1077.

The Government then played Clip 3.  *See* Gov't Ex. 79 (Clip 3).  Clip 3 depicts the robbers inside of a car, driving down a sunlit city street, busy with traffic and pedestrians.  When the driver says, "Say your prayers; here we go," each robber dons a mask depicting an elderly nun: the skin is deeply furrowed, and the features exaggerated.  Each robber also wears a nun's habit.  The clip ends with a close-up of one robber—assault rifle in his gloved hand—staring out of the car window, straight into the camera.  The music builds to a crescendo and the excerpt

2

closes on a dramatic, dissonant chord.  The Government did not question the witness about this clip.

*      *      *

Although the standard of review is highly deferential, *see United States v. Massino*, 546 F.3d 123, 132-33 (2d Cir. 2008) (per curiam), "the broad discretion afforded to the district court" in weighing the admissibility of evidence under Rule 403 "is not limitless," *United States v. Morgan*, 786 F.3d 227, 232 (2d Cir. 2015).  Evidence may be unfairly prejudicial if, for example, "it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence," such as a "tendency . . . to prove some adverse fact not properly in issue or unfairly to excite emotions against the defendant."  *Massino*, 546 F.3d at 132-33 (quoting *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980)).  On review of a district court's evaluation of evidence, this Court will "generally 'maximiz[e] its probative value and minimiz[e] its prejudicial effect.'"  *United States v. LaFlam*, 369 F.3d 153, 155 (2d Cir. 2004) (per curiam) (alterations in original) (quoting *United States v. Downing*, 297 F.3d 52, 59 (2d Cir. 2002)).  Even so, weighing the movie clips' minimal probative value against their potential for unfair prejudice, I would hold that the district court abused its discretion in allowing them to be introduced into evidence.

The Government argued, in its motion *in limine* before the district court, that the excerpts bear a "striking resemblance" to the 2012 robbery in this case because in both situations the robbers (1) pour bleach on surfaces, (2) wear police uniforms as disguises, (3) use personal information to threaten an employee at the scene, and (4) wear life-like masks.  J.A. at 423-24.  The Government argued that the clips "provide the context and motivation for the drastic change in the defendants' robbery techniques" from 2010 to 2012 and that there is "little risk" of unfair

3

prejudice because "it will be identified as a fictional Hollywood film depicting actors." J.A. at 425.

In reviewing the three excerpts, I find that, despite the similarities between the 2012 robbery and the fictive crimes, the clips were unfairly prejudicial. According to the Government, Clip 2 was probative to the extent that it illustrates why the defendants used bleach to destroy DNA evidence at the crime scene. J.A. at 1076. But Defendant-Appellant Akeem Monsalvatge would already have been aware of the importance of destroying DNA evidence: when he was arrested for the 2010 robbery, he was told that his DNA was found at the scene. *See, e.g.*, J.A. at 2427. The defendants, therefore, did not need a Hollywood movie to instruct them on the role DNA evidence plays in identifying perpetrators. Although it is possible that the defendants' use of bleach was informed by the movie, a simple search on Google comes to the same lesson: one of the first results in a search for "what destroys DNA at a crime scene?" is a discussion board that suggests using bleach. *What destroys dna?*, SciForums.com, http://www.sciforums.com/threads/what-destroys-dna.45471/. The probative value of this clip regarding the use of bleach is, at best, slight.

Clip 4 depicts a robber, disguised as a police officer, using the bank employees' personal information to threaten them. The Government contends that when committing the 2012 robbery, the defendants were mimicking the fictional robbers in the movie. But, given the uncommonly clumsy manner in which the defendants committed the 2010 robbery—entering through the roof of a cash-checking business and leaving behind tools—it is likely that the defendants actively considered alternative approaches for future robbery attempts. Impersonating a police officer is not a novel technique: the New York City Police Department even has a Police Impersonation Investigation Unit. *See, e.g.*, J.A. at 1004-05. However, the use

4

of the Pay-O-Matic employee's personal information while dressed as a police officer is similar

to *The Town*, and there is some probative value in this similarity.

Finally, the excerpts' probative value regarding the defendants' use of masks is

negligible. Not only is wearing a disguise for a robbery a *scène à faire*, but, when committing

the 2010 robbery, the defendants had already employed the technique of covering their faces

using, according to one witness at trial, a "cloth mask." J.A. at 1400, 1402. Thus, with respect

to their use of a device to obscure their faces, any similarity between the 2012 robbery and *The*

*Town* does not tend to prove that the defendants adopted a new approach.

As this Court has long held: "The length of the chain of inferences necessary to connect

the evidence with the ultimate fact to be proved necessarily lessens the probative value of the

evidence, and may therefore render it more susceptible to exclusion as unduly confusing,

prejudicial, or time-consuming . . . ." *United States v. Kaplan*, 490 F.3d 110, 122 (2d Cir. 2007)

(alteration in original) (quoting *United States v. Ravich,* 421 F.2d 1196, 1204 n.10 (2d Cir. 1970)

(Friendly, J.)). The Government did not argue that the defendants acknowledged that these

techniques were gleaned from *The Town*. Instead, the Government's theory at trial was that a

photograph showing Monsalvatge wearing a t-shirt that featured an image from the movie

suggests that he and his co-conspirators used the film as a how-to-guide for their 2012 robbery.

J.A. at 1079-80. Although it is a reasonable inference that the t-shirt indicates that Monsalvatge

was familiar with the movie, it is a stretch to infer that he admired the movie for its educational

value. The inference that the defendants sought to emulate the actions of fictive criminals

because one individual ordered a t-shirt depicting a scene from a widely released, blockbuster

film is beyond tenuous, which further minimizes the probative value the clips might have. *Cf.*

*United States v. Gamory*, 635 F.3d 480, 493 (11th Cir. 2011) (finding a rap video inadmissible

5

where video was prejudicial and "not clearly probative of [defendant's] guilt," and where connection between defendant and video's creation was tenuous).

The majority opinion cites cases from outside of this circuit where film excerpts were admitted to explain a defendant's behavior. In each of those cases, however, the connections between the defendant and the film, and the film and the crime, were much stronger. *See United States v. Schneider*, 801 F.3d 186, 199-200 (3d Cir. 2015) (affirming decision to admit clips from a film about a ballet dancer and his older patron and lover in a case where older defendant had shown the film to his victim, a young ballet dancer); *United States v. Smith*, 749 F.3d 465, 496-97 (6th Cir.) (affirming admission of film excerpts in which "salesmen working for a fictional investment firm employ high-pressure sales tactics to defraud clients" in a prosecution for fraud where defendants "made copies of [the film] and encouraged salesmen to learn from the movie"), *cert. denied*, 135 S. Ct. 307 (2014); *United States v. Jayyousi*, 657 F.3d 1085, 1108-09 (11th Cir. 2011) (affirming admission of clips from a CNN interview with Osama bin Laden that two defendants had discussed in phone calls); *United States v. Wills*, 346 F.3d 476, 484 n.6, 489 (4th Cir. 2003) (affirming decision to admit excerpts of the film *The Casino* to explain what one defendant meant when he stated in a tape-recorded conversation, "I'm *Casino*. . . . You see the movie? . . . Well anyway, I was doing a *Casino* joint"). Here, in contrast, the Government adduced no evidence that the defendants watched *The Town*, discussed the film with one another, or, most importantly, developed a plan based on the film. Because *The Town* excerpts are so far removed from the ultimate fact to be proven—that is, whether the defendants actually committed robbery—the probative value of the clips is diminished. *See Kaplan*, 490 F.3d at 122 ("The jury was required to draw a series of inferences, unsupported by other evidence, to connect Galkovich's testimony . . . [to] the ultimate issue in the case. Under the circumstances, the

6

district court should have concluded that whatever slight probative value the testimony might have had was outweighed by the risk that the jury would draw improper inferences from the testimony.").

Although some of the techniques employed by the fictional robbers in *The Town* are similar to the *modus operandi* in this case, there are significant differences that vitiate the clips' probative value. *See, e.g.*, *United States v. Reese*, 933 F. Supp. 2d 579, 582-83 (S.D.N.Y. 2013) (citing *United States v. Danzey*, 594 F.2d 905, 911 (2d Cir. 1979)) (finding that prior acts were dissimilar enough to be inadmissible to show *modus operandi* under Rule 404(b)). Unlike the robbers in the movie, the defendants did not carry "very fierce-looking assault weapons," as the district court noted to the jury. J.A. at 1307. Although one defendant showed one of the Pay-O-Matic employees a photograph of her house and asked if she recognized it, he did not claim that someone was currently outside the house ready to harm the victim's family. J.A. at 700-01, 1307. The defendants' masks were life-like disguises, unlike the Grim Reaper masks and distorted nun masks worn by the robbers in *The Town*. *See, e.g.*, J.A. at 699-700, 732. Given the generic and superficial similarities between the movie excerpts and the 2012 robbery, the long inferential chain required to connect the evidence to the crime, and the differences between the excerpts and the crime, the clips' probative value is slight.

To the extent that the excerpts are marginally probative and the clips "tend[] to prove the fact or issue that justified [their] admission into evidence," that value is outweighed by the serious risk of "unfairly . . . excit[ing] emotions against the defendant." *Massino*, 546 F.3d at 132-33. The potential for unfair prejudice extends beyond the fact that the clips depict robbers carrying heavy assault weapons, which are far more deadly than the pistols used by the defendants. Unlike the objective of a criminal trial—to ensure the fair and impartial

7

administration of justice—the goal of commercial cinema is to thrill and entertain. It is a manipulative art designed to elicit an emotional response from the viewer. To this end, filmmakers employ a variety of tools such as costumes, music, cinematography, lighting and editing—strategies not utilized in surveillance videos routinely presented at trials. The psychological effect on a juror of watching an actor dressed as the Grim Reaper gripping a submachine gun as he robs a bank to a thundering drum beat should not be underestimated. The risk that a juror—even a juror who has been instructed by the court to ignore the "make believe" elements of the evidence, J.A. 1075—might conflate fiction and reality is obvious. And, it is a risk that threatens to undermine a defendant's right to a fair trial. *Cf. United States v. Sampson*, 335 F. Supp. 2d 166, 191-93 (D. Mass. 2004) (excluding memorial video of victim that featured "evocative" and "poignant" music that "would have inflamed the passion and sympathy of the jury"). As *The New York Times* noted in its review of *The Town*, Clip 2, which was part of the film's opening sequence, is "brutal" and "evidence of Mr. Affleck's skill and self-confidence as a director." A. O. Scott, *Bunker Hill to Fenway: A Crook's Freedom Trail*, N.Y. Times (Sept. 17, 2010), http://www.nytimes.com/2010/09/17/movies/17town.html.

The potential for prejudicial impact is further amplified by the fact that the magistrate judge who conducted the *voir dire* did not ask the *venire* whether they had seen *The Town*. The *voir dire* was conducted on the morning on July 29, 2013, by Magistrate Judge James Orenstein. *See* J.A. at 434. Indeed, when discussing the issue of whether to ask potential jurors if they had seen the movie, Judge Orenstein stated that "If I were at the defense table, quite honestly, I think I would want to know just to have more information rather than less, but if you object, I'm not going to do it." J.A. at 439. Because the district court had not yet ruled on the clips' admissibility—the district court judge ruled on the Government's motion *in limine* later that day,

8

J.A. at 643—defense counsel for Defendant-Appellant Derrick Dunkley declined Judge Orenstein's invitation to question potential jurors about the film, stating, "I object to it. And even if the movie does come in, which I don't think it's that likely . . . [,] I think even bringing it up suggests that it's similar to the actions in this case which I don't think is true." J.A. at 439-40. That some of the jurors may have seen the movie—which is not unlikely, given that *The Town* was the highest-grossing movie in its opening weekend (over $92 million domestically) and was nominated for an Academy Award, *see The Town*, Box Office Mojo, http://www.boxofficemojo.com/movies/?id=town10.htm— eliminates the limiting effect of the clips' tailoring and exponentially increases the risk of unfair prejudice.

This circuit has not addressed the use of fictive videos as evidence, but other courts have expressed deep distress about such evidence's impact on the jury. *See Gamory*, 635 F.3d at 493 (finding a rap music video to be unfairly prejudicial because it contained content unnecessary and unrelated to the criminal case); *Bannister v. Town of Noble*, 812 F.2d 1265, 1269 (10th Cir. 1987) (discussing the concern that a "jury will better remember, and thus give greater weight to, evidence presented in a film as opposed to more conventionally elicited testimony"); *Sampson*, 335 F. Supp. 2d at 192-93 (discussing how a video "would have inflamed the passion and sympathy of the jury"); *Thomas v. C. G. Tate Constr. Co.*, 465 F. Supp. 566, 571 (D.S.C. 1979) (discussing the concern that a video may "stand out in the minds of the jury" and will have a "dominating effect [that] will distract the jury from its proper consideration of other issues they will be called on to decide"); *cf. Territory of Guam v. Shymanovitz*, 157 F.3d 1154, 1158-59 (9th Cir. 1998) (finding that pornographic magazines found in the apartment of a defendant accused of sexual contact with minors was inadmissible to show propensity, lamenting that the case against an individual could be made stronger because of his book collection); *United States v.*

9

*Stone*, 852 F. Supp. 2d 820, 830-31 (E.D. Mich. 2012) (holding anti-government books found in the defendant's home inadmissible, saying that connecting the acts in the books to the allegations in the case was "pure speculation" and worrying about the risk of "associating [the d]efendants in the minds of the jurors with the perpetrators of these other crimes [featured in the books]"); *see generally United States v. Johnson*, 529 F.3d 493, 501 (2d Cir. 2008) ("We recognize that the government may be tempted to make its presentation to the jury more compelling, dramatic, and seductive . . . .").

Although it is true that, generally, this Court "declines to second-guess a district court's admission of relevant video or media evidence," Federal Rule of Evidence 403 requires more than merely "an identifiable connection to an issue or defendant in the case." (Maj. Op. at 34.) The cases cited by the majority do not hold otherwise; indeed, all show a strong nexus between the challenged evidence and the criminal activity at trial. In *United States v. Cromitie*, this Court admitted a "20–second video of a demonstration explosion set off by a bomb placed on the back seat of a car and constructed with the type and amount of material that the defendants thought was in the fake devices they were planning to use in the operation." 727 F.3d 194, 225 (2d Cir. 2013). The video was introduced "to establish that the fake bombs, if real, would have qualified as 'destructive devices'" under relevant statutes. *Id.* These fake bombs were created by the FBI and provided to the defendants, *United States v. Cromitie*, No. 09 Cr. 558, 2011 WL 1842219, at *3 (S.D.N.Y. May 10, 2011), *aff'd*, 727 F.3d 194, which made the video demonstration important to the Government's charge that the defendants conspired to do harm. In *United States v. Abu-Jihaad*, this Court upheld the admission of pro-jihadist videos found on a terrorist organization website because there was extensive evidence of correspondence between the defendant and the organization. 630 F.3d 102, 113, 133-34 (2d Cir. 2010). And in *United States*

10

*v. Salameh*, this Court affirmed the admission of anti-American materials—including a video clip depicting a bombing that closely resembled the World Trade Center bombing committed by the defendants as well as documents that provided instructions on how to construct bombs and mix explosives to destroy buildings—that were in the possession of two defendants because the evidence demonstrated not only the "motive and intent" of the defendants, but also "formulae for the same explosives that were used to construct the World Trade Center bomb, and [defendants'] fingerprints were found on those pages," and "traces of those same explosives were found in the homes of, and on objects linked to" the defendants. 152 F.3d 88, 111 (2d Cir. 1998). The film clips from *The Town* are far less probative than the evidence in these three cases where only a minimal inferential leap is required to connect the video clips to the crimes alleged.

Finally, to the extent the similarity between the movie excerpts and the 2012 robbery is probative, the district court should have considered other means of admitting the facts of that similarity into evidence that would have avoided the unfairly prejudicial nature of the film clips. "[W]hen Rule 403 confers discretion by providing that evidence 'may' be excluded, the discretionary judgment may be informed not only by assessing an evidentiary item's twin tendencies, but by placing the result of that assessment alongside similar assessments of evidentiary alternatives." *Old Chief v. United States*, 519 U.S. 172, 184-85 (1997); *see also* Fed. R. Evid. 403 advisory committee notes ("The availability of other means of proof may also be an appropriate factor."). Rule 403 "permits a judge to consider both the defendant's willingness to stipulate and the potential for prejudice [in later phases] in conducting the requisite [Rule 403] balancing." *United States v. Al-Moayad*, 545 F.3d 139, 160 (2d Cir. 2008) (alterations in original) (quoting *United States v. Pepin*, 514 F.3d 193, 206-07 (2d Cir. 2008)). Where there is alternative but equally probative evidence available, a court may consider the "marginal

11

probative value" of the proposed evidence relative to the other evidence in the case. *Old Chief*, 519 U.S. at 185 (citing 1 McCormick 782, and n. 41); *see* 1 McCormick On Evid. § 185 (7th ed.) ("If other evidence, which does not carry the same dangers with it, could be used to establish the same fact, then the marginal probative value of the evidence in question is slight or non-existent.").

Accordingly, in *Al-Moayad*, this Court concluded that the district court acted arbitrarily in admitting the evidence that "almost entirely unrelated to the elements of the charges." 545 F.3d at 161. Such evidence is not afforded the same weight when applying the general rule that "the prosecution is entitled to prove its case by evidence of its own choice." *Id.* (quoting *Old Chief*, 519 U.S. at 186). Rather, where testimony "never referred to either defendant or to any aspect of the investigation or charges against them," the Supreme Court's concern about the government's "natural sequence of narrative evidence," *id.* (quoting *Old Chief*, 519 U.S. at 189), "has little to no application," *id.* The testimony "amounted to a blatant appeal to the jury's emotions and prejudices," and omitting the testimony "would not have disrupted the narrative flow of the government's trial evidence." *Id.* Given the availability of the less prejudicial option—the defendants agreed to stipulate to the probative facts—this Court concluded that admitting the evidence was arbitrary and reversible error. *Id.* at 160-61.

Similarly here, to the extent the film excerpts had probative value by showing similarities between certain criminal techniques utilized in both *The Town* and the 2012 robbery, the district court could have allowed a less prejudicial form of evidence—such as a stipulation or additional testimony from the detective who testified that he had "seen the movie several times" and gave a brief overview of the movie, J.A. 1073-74. The movie clips did not add probative value; they increased the risk of unfair prejudice.

In sum, I do not think Rule 403 allows a court to risk that a juror will watch clips featuring criminal acts and resist the film's strong emotional appeal, an effect that a Hollywood movie is designed to have. *See United States v. Robinson*, 560 F.2d 507, 513-14 (2d Cir. 1977) ("Absent counterbalancing probative value, evidence having a strong emotional or inflammatory impact . . . may pose a risk of unfair prejudice because it tends to distract the jury from the issues in the case and . . . [might] arouse the jury's passions to a point where they would act irrationally in reaching a verdict." (internal quotation marks omitted)). In particular, Clips 2 and 3, which were relevant only with respect to the similarities of robbers wearing a mask and spreading bleach, had only limited and speculative probative value. Considering the prejudicial effect of jurors conflating the defendants with the actors and actions depicted in the fictive sequences, and given the availability of equally probative but vastly less prejudicial forms of evidence, I would hold that the district court abused its discretion in allowing the film clips.

*         *         *

Furthermore, the district court abused its discretion by failing to adequately weigh the movie excerpts' probative value against their potential for unfair prejudice. "To avoid acting arbitrarily, the district court must make a conscientious assessment of whether unfair prejudice substantially outweighs probative value." *United States v. Kadir*, 718 F.3d 115, 122 (2d Cir. 2013) (quoting *Al–Moayad*, 545 F.3d at 160); *see also Figueroa*, 618 F.2d at 943. This Court will reverse an evidentiary determination if "'there was inadequate consideration of the probative value of the evidence,' or a failure to adequately 'consider the risk of unfair prejudice and to balance this risk against probative value.'" *Morgan*, 786 F.3d at 232 (quoting *Figueroa*, 618 F.2d at 942); *cf. Salameh*, 152 F.3d at 111 (affirming where the "record amply demonstrates that [the district court] made a 'conscientious assessment' of the proffered evidence and properly

13

determined that unfair prejudice did not substantially outweigh the probative value of these materials").

In its motion *in limine*, the Government argued that the film clips were relevant under Federal Rule of Evidence 401 and admissible under Federal Rule of Evidence 402 based on Monsalvatge's "custom-made T-shirt" depicting one of the movie's scenes and the "film's striking similarity to important aspects of the 2012 robbery," which "helps explain the origin of defendants' *modus operandi* during that robbery." J.A. at 424-25. The Government stated that it would limit unfair prejudice by identifying the film as fictional and showing only limited clips. *See* J.A. 424-25. Counsel for Dunkley and Defendant-Appellant Edward Byam each submitted a letter opposing the Government's motion; the former argues that the clips are inadmissible under Rule 403. J.A. at 430; *see* J.A. at 428-30, 431-33.

When the district court decided the issue, it focused exclusively on relevance and did not make a finding on the record regarding Rule 403. In a hearing in the afternoon of July 29, 2013, the district court ruled on the Government's motion *in limine*, stating in full: "The movie 'The Town' is an interesting thing. We've looked at the clips. I understand that there was a T-shirt recovered from Mr. Monsalvatge depicting a particular still scene from that movie. I understand the theory. I think it's admissible, and I will allow it." J.A. at 643. Significantly, the trial judge did not evaluate the probative value of the evidence or the risk of unfair prejudice, nor did he appear to balance the two. *See Morgan*, 786 F.3d at 232. I would find, therefore, that the district court abused its discretion by failing to make a clear record of its "conscientious assessment."

\*　　\*　　\*

Finally, this Court reverses a district court on an evidentiary error only when the error affects "substantial rights." Fed. R. Crim. P. 52(a); Fed. R. Evid. 103(a); *see also, e.g.*, *Kaplan*,

14

490 F.3d at 122. On such review, an appellate court must ask "what effect the error had or reasonably may be taken to have had upon the jury's decision." *Kotteakos v. United States*, 328 U.S. 750, 764 (1946). This Court must answer: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" *United States v. Taylor*, 745 F.3d 15, 27 (2d Cir. 2014) (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)). Among the factors this Court principally considers are: "(1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence." *Id.* (quoting *Zappulla v. New York,* 391 F.3d 462, 468 (2d Cir. 2004)). "We have repeatedly held that the strength of the government's case is the most critical factor in assessing whether error was harmless." *United States v. McCallum*, 584 F.3d 471, 478 (2d Cir. 2009) (citing *United States v. Lombardozzi*, 491 F.3d 61, 76 (2d Cir. 2007)).

Although the admission of the film excerpts was an abuse of discretion, the admission was harmless error. The evidence presented against the defendants regarding the 2012 robbery was overwhelming, and the film clips' significance to the crimes charged minimal.

The Government's case was strong. In addition to extensive evidence regarding the 2010 robbery and the attempted robbery, the Government presented a variety of evidence tying the defendants to the 2012 robbery. First, evidence tied Byam to the scene of the crime. Surveillance videotape depicted the three robbers showing a Pay-O-Matic employee a photograph of the employee's house. The photo, which fell to the floor and was later recovered by investigators, J.A. at 857, 1057-58, was stamped "Walgreens" and contained identifying information including the Walgreens store number, an order number, and a date, J.A. at 861, 1058. Investigators identified the Walgreens store, which matched the order number to a receipt

15

that identified the name "Byam, E." and a phone number that matches Byam's. J.A. at 866-67, 1019, 1115. Surveillance video from the Walgreens store showed Byam dropping something off at the Walgreens photo counter in early December 2011 and picking something up the next day. J.A. at 884-86.

The Government presented evidence that Dunkley purchased NYPD disguises online. The evidence indicated that a "Derrick Davis"—Davis is the last name of Derrick Dunkley's aunt—ordered three NYPD raincoats on eBay in November 2011 and had them shipped to Dunkley's residence. J.A. at 1029-33, 824, 1998. An eBay seller testified that "Derrick Davis" also bought three leather NYPD-style badge holders, which were shipped to Dunkley's address. J.A. at 1239-42. An eBay corporate representative testified that the "Derrick Davis" user account that made these purchases was linked to Dunkley's credit card and address. J.A. at 1547, 1551-52, 1554-57.

The Government also presented evidence that Byam and Monsalvatge were involved in purchasing high-end masks that match those used by the robbers during the 2012 robbery. An NYPD detective testified that, based on his review of the surveillance footage, he concluded that the robbers were wearing high-quality, life-like masks. J.A. at 887-90. The detective contacted two companies that make such masks to verify whether either had shipped masks resembling the surveillance footage to anyone in the New York area. J.A. at 890. The owner of Composite Effects, one of those companies, testified that Byam had ordered three special effects masks in October 2011, which totaled just under $1,800. J.A. at 1446. The masks were shipped to Monsalvatge's girlfriend, with whom Monsalvatge lived. J.A. at 1130, 1445, 2015. E-mails sent by Byam to Composite Effects included the same phone number that was listed on the Walgreen's receipt for the photograph shown during the robbery to the Pay-O-Matic employee.

16

J.A. at 866-67, 1115, 1445. In late November 2011, Byam e-mailed Composite Effects to state that he was "extremely pleased" with the masks and to ask for advice on wearing the masks. J.A. at 1451-52, 1171. The owner of Composite Effects identified one of the masks in the surveillance video as one created by his company, J.A. at 1452-55, and testified that an individual's lips may be visible through the mask when not properly fitted, J.A. at 1449-50, which could explain one witness's account that all three robbers had brown lips despite their faces being light-skinned, J.A. at 761-62, 872-83.

When Monsalvatge was arrested, he was found with a police scanner that resembled the one in the surveillance video. J.A. at 2020-22; *see* J.A. at 880. When Byam was arrested, he had in his possession a partially completed Pay-O-Matic employment application, J.A. at 2122-24, and luxury items—including Gucci luggage, a Rolex watch worth over $10,000, Louis Vuitton sneakers, and a gold and diamond earring—were found at his residence, J.A. at 2130. When Dunkley was arrested, a search of his computer showed an internet search for "NYPD jackets" and multiple searches about the federal criminal justice system. J.A. at 2264-67.

The Government connected the black Ford Explorer used in the robbery to Byam; the car was also caught on surveillance tape outside the Pay-O-Matic twice in the week before the robbery. J.A. at 891-92; *see* J.A. at 713, 799-801, 852-53, 881-83. The Government presented evidence establishing that all three defendants had conducted transactions at a Pay-O-Matic store, totaling nine transactions in 2010 and 2011, J.A. at 819-28, and presented text messages between the defendants that suggested criminal activity, *see generally* J.A. at 2291-306.

Finally, the Government presented evidence establishing that all three defendants went on spending sprees in the months after the 2012 robbery: Dunkley deposited thousands of dollars of cash into his checking account, J.A. at 1344-50; Monsalvatge opened a new bank account on

17

February 15, 2014 and deposited over $6,000 in cash, J.A. at 1182-85; Byam and Monsalvatge took a trip to Cancun in May 2012, J.A. at 1131; Byam bought his girlfriend a pair of Christian Louboutin shoes and bought himself Gucci luggage, J.A. at 1133-35; and Monsalvatge's accounts showed thousands of dollars spent on spas, luxury goods, and extensive travel, J.A. at 1184-88.

The film excerpts from *The Town* were a relatively small part of the evidence presented by the Government: the clips that were played totaled only one minute in length, a small sliver of the six-day trial, and were only briefly addressed by the testifying witness. *See* J.A. at 1074-77. The excerpts were not discussed again until summations, when they were again only one small piece of a much larger picture. *See* J.A. at 2426-28. Counsel for each defendant discredited the importance of the clips in their respective summations. *See* J.A. at 2474, 2497-98, 2526. In light of the weight of this evidence and the relatively small role the film clips played at trial, it is beyond a reasonable doubt that a jury would have convicted the defendants regardless of the admission of the movie excerpts. *See United States v. Chandia*, 514 F.3d 365, 375 (4th Cir. 2008) ("Even if admission of the video clips was error, it was harmless in this case. The clips were not a central part of the government's case; in fact, they took up only three minutes during the nearly five days the government spent presenting its case-in-chief. In addition, the excerpts were shown only once, were not used to frame the government's case at the trial, and were not unduly emphasized during the government's arguments to the jury."); *see also McCallum*, 584 F.3d at 478. Accordingly, their admission constitutes harmless error.

\*　　\*　　\*

In sum, because the film clips' minimal probative value is significantly outweighed by the potential for prejudice, the district court abused its discretion in admitting them and in failing

18

to conduct the requisite balancing under Federal Rule of Evidence 403. However, given the overwhelming weight of the evidence against the defendants and the relatively minimal role the film clips played at trial, I find that the error was harmless and I would affirm the convictions. Accordingly, I respectfully concur in the judgment.